John DOE, Richard Roe and Paul Poe, Intervenors-Plaintiffs,

v.

SELECTIVE SERVICE SYSTEM, Major-General Thomas K. Turnage, Director, and United States Department of Education, Terrel H. Bell, Secretary, Defendants.

Bradley BOE, Carl Coe and Frank Foe, Plaintiffs,

v.

SELECTIVE SERVICE SYSTEM, Major-General Thomas K. Turnage, Director, and United States Department of Education, Terrel H. Bell, Secretary, Defendants.

Nos. 3–82 Civ. 1670, 3–83 Civ. 100.

United States District Court, D. Minnesota.

March 10, 1983.

William J. Keppel, Minneapolis, Minn., for plaintiffs John Doe, Richard Roe and Paul Poe.

E. Gail Suchman and Daniel W. Lass, Minneapolis, Minn., for Bradley Boe, Carl Coe and Frank Foe.

Neil H. Koslowe, Washington, D.C., and James M. Rosenbaum, U.S. Atty., Minneapolis, Minn., for defendants Selective Service System, Major-General Thomas K. Turnage, Director, and U.S. Dept. of Educ., Terrel H. Bell, Secretary.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon the motions of plaintiffs in these cases for a preliminary injunction enjoining the defendants from enforcing Section 1113 of the Department of Defense Authorization Act of 1983, Pub.L. No. 97–252, 96 Stat. 748 (1982) (to be codified at Section 12(f) of the Selective Service Act, 50 U.S.C.App. § 462(f) (1982)) and any regulations promulgated thereunder. Defendants oppose the motions.

Plaintiffs John Doe, Richard Roe, Paul Poe, Bradley Boe, Carl Coe and Frank Foe are all male residents of Minnesota, 19 to 21 years old, subject to Section 3 of the Selective Service Act who intend to apply for financial aid for the 1983–84 school year under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070–1089, who will be unable to complete their educations without financial aid, and who cannot file a truthful statement of compliance with Section 3 and regulations thereunder. Defendant Selective Service System is an agency of the United States. Defendant Major-General Thomas Turnage is the Director of the Selective Service System. Defendant United States Department of Education is an agency of the United States. Defendant Terrel H. Bell is the Secretary of the United States Department of Education.

It is important to note at the outset that these cases involve only a challenge to the constitutionality of Section 1113 linking availability of federal financial assistance under Title IV of the Higher Education Act of 1965 to draft registration. These cases do not challenge the constitutionality of the law requiring registration: the validity of that law has already been upheld by the United States Supreme Court in *Rostker v.*

*Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). In addition, these cases are not cases in which the propriety of registration versus nonregistration has been raised or argued. Finally, this decision should not be interpreted as passing on the constitutionality of any law that would deny federal financial assistance to students after conviction for nonregistration. That issue is not before the court. The court turns now to the issues that these cases do raise.

In considering plaintiffs' motions for a preliminary injunction, the court must determine whether or not the standards set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981) have been met. The court in that case held that:

> whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114.

I. The Threat of Irreparable Harm

Plaintiffs contend that they will suffer irreparable harm if an injunction does not issue. Plaintiffs John Doe and Paul Poe allege that they will be unable to complete their educations without financial aid. Plaintiff Richard Roe alleges that he may be unable to complete his education without financial aid. Plaintiffs Bradley Boe, Carl Coe and Frank Foe similarly allege that they will be unable to complete their educations without financial aid.

Plaintiffs point to the status of education as an important right in our society and allege that deprivation of that right constitutes irreparable harm. The United States Supreme Court in *Pyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), declined to find public education a right granted by the Constitution, but did find that education was not merely some gov-

ernmental benefit indistinguishable from other forms of social welfare legislation. *Id.* 102 S.Ct. at 2397. After noting the importance of education in maintaining our basic institutions, the Court observed that:

> education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.

*Id.* Education has long been recognized as providing the means to "earn an adequate livelihood, to enjoy life to the fullest, [and] to fulfill ... the duties and responsibilities of good citizens." *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 157 (5th Cir.), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

Plaintiffs contend that deprivation of a post-secondary education, or even delay in attaining that education, and consequent inability to pursue a chosen profession or occupation constitutes harm for which there is no adequate remedy at law. The Supreme Court has upheld a district court's conclusion that even a temporary inability to practice a profession constitutes such harm. *See Withrow v. Larkin,* 421 U.S. 35, 44 n. 8, 95 S.Ct. 1456, 1463 n. 8, 43 L.Ed.2d 712 (1975).

Defendants contend that plaintiffs have failed to demonstrate a threat of irreparable harm because plaintiffs have not alleged that they have actually applied for Title IV assistance, qualified for that assistance, and been denied such assistance. Under proposed regulations, most students will not be required to complete a statement of compliance until just prior to the time they actually receive the assistance. Thus, defendants argue, plaintiffs have not substantiated any present or immediately threatened irreparable harm to themselves.

The court is not persuaded by defendants' argument. The application process for financial aid has already begun. As noted in

the Memorandum Order, January 24, 1983, § 1113 by its terms imposes a mandatory system linking availability of financial aid to draft registration. It was there pointed out that, "it must therefore be presumed that the Secretary will comply with the mandatory terms of Section 1113, and that implementation of the Section will lead inexorably to the denial of financial assistance, although the exact date of that denial cannot be presently determined." *Id.* at 6. Plaintiffs here allege that they intend to apply for aid, that they will be unable to complete their educations without aid, and that they cannot file a truthful statement of compliance. It is thus inevitable that plaintiffs will be denied financial assistance and, consequently, the opportunity to pursue their educations. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough ...." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974) (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)).

Plaintiffs also claim that they are threatened with a second type of irreparable harm. Plaintiffs allege that § 1113 violates their fifth amendment right against self-incrimination. Plaintiffs argue, first, that the statute penalizes those who assert the fifth amendment by denying them access to Title IV funds, impermissibly burdening the exercise of that privilege, and, second, that the statute's scheme of operation serves to incriminate those who assert the privilege because the very act of applying can lead directly or indirectly to incriminating evidence.

Defendants again maintain that plaintiffs have failed to establish a threat of irreparable harm. According to defendants, plaintiffs cannot establish that any action that poses an immediate danger to their fifth amendment rights has been taken against them. Plaintiffs do not claim that they need a preliminary injunction in order to decide whether to apply for Title IV funds, defendants argue. Furthermore, plaintiffs will not be required to submit a statement of compliance until much later in the application process.

The court finds defendants' arguments unconvincing. Many unregistered students, including plaintiffs, are faced with the choice *now* of waiving their right against self-incrimination by beginning an aid application process that will inevitably require them to furnish proof of registration or, alternatively, of foregoing financial assistance to avoid self-incrimination. Educational institutions have traditionally imposed deadlines for aid applications that precede the actual awarding of funds by several months. The University of Minnesota, which plaintiffs Doe, Poe and Roe plan to attend, last year set a deadline of March 1, 1982 for applications for the 1982–83 school year. No such deadline has been set for the current year, apparently because of these actions, but at some point an application in practical effect is too late. In addition, some schools and universities are requiring students to certify compliance with registration requirements at the time of application. Defendants acknowledge that since final regulations may not be published until late this spring, many students will be anxious to know at the earliest opportunity whether and to what extent they will receive benefits. Defendants surmise that institutions "may have decided to *request* that students voluntarily supply registration information at the time they apply .... Indeed, the Secretary has encouraged institutions to do this." *See* defendants' "Statement of Points and Authorities in Opposition to Plaintiffs' Motion for a Preliminary Injunction," at 7, n. 1. Thus, students at such colleges must either "voluntarily" supply potentially incriminating information or forego financial aid.

Plaintiffs in these cases are nonregistrants who would like to apply for financial aid but cannot do so without allegedly infringing their fifth amendment rights against self-incrimination. Although plaintiffs need not make their choice at this exact point in time, the dilemma they face is inevitable. Thus, they have clearly shown that they face the *threat* of irrepara-

ble harm. The court finds that plaintiffs have met the first of the four *Dataphase* standards.

## II. Balancing

The second *Dataphase* standard requires the court to balance the threat of harm to the movant with the injury that granting the injunction would inflict on the other parties.

Defendants argue that granting an injunction would impair their ability to implement and enforce § 1113 in two ways: first, a freeze on the regulatory process would impair the ability of the Secretary of Education to issue final implementing regulations on time; and second, the Secretary would have to decide whether to halt final processing of applications until the injunction was lifted or to allow processing to go forward, making all awards subject to later recoupment.

Plaintiffs contend that it would be senseless to delay their relief in order to permit the government to issue regulations for the implementation of an unconstitutional act. Plaintiffs further argue that since the government has adequate mechanisms for enforcing violations of the registration requirement, the defendants will not be injured by issuance of the injunction.

The court agrees with defendants that they may suffer some administrative inconvenience and delay in implementing final regulations if an injunction halting all action by the government issues. The court, however, finds that the threat of irreparable harm to plaintiffs far outweighs any potential injury to defendants. Furthermore, a properly framed injunction could allow defendants to proceed through publication of final regulations but could prohibit any action by defendants to enforce those regulations pending final disposition of these lawsuits.

## III. Probability of Success on the Merits

■ The third *Dataphase* factor involves consideration of the probability that the movant will succeed on the merits. Plaintiffs are not required to prove a greater than fifty percent likelihood that they will prevail on the merits. *Dataphase*, 640 F.2d at 113. The court there warned against a wooden application of the probability test saying:

> [T]he court ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success.... [W]here the balance of other factors tips decidedly toward movant a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Id.* With this standard in mind, the court now examines plaintiffs' challenges to § 1113.

### A. Bill of Attainder

Plaintiffs allege that § 1113 is a bill of attainder in violation of U.S. Const. art. I, § 9, cl. 3. A bill of attainder is a law that legislatively determines guilt and inflicts punishment upon an identifiable individual or group without the protections of a judicial trial. *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977).[1] The writings of the framers of our Constitution indicate that the "Bill of Attainder Clause was not intended as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function ...." *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965).

Thus the Bill of Attainder clause not only was intended as one implementation

---

1. Historically the bill of attainder was a parliamentary act sentencing one or more persons to death used in England against persons who threatened to or attempted to overthrow the government. In addition to the death sentence, the attainted party's heirs could not inherit his property. The "bill of pains and penalties" was similar but its penalty was less than death, *e.g.,* banishment or deprivation of the right to vote. Most bills of both types named the parties to whom they applied, but a few merely described them.

of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.

*Id.* at 445, 85 S.Ct. at 1713.

The Supreme Court has avoided construing the clause narrowly and instead has read it in light of the evil it was intended to bar. The Court has struck down, for example, as a bill of attainder: an amendment to the Missouri Constitution that provided no one could engage in a number of specified professions unless he first swore he had taken no part in the rebellion against the Union, *Cummings v. Missouri,* 71 U.S. (4 Wall) 277, 18 L.Ed. 356 (1867); a federal statute that required attorneys to take a similar oath before they could practice in federal courts, *Ex parte Garland,* 71 U.S. (4 Wall) 333, 18 L.Ed. 366 (1867); § 304 of the Urgent Deficiency Appropriation Act, 1943, which prohibited payment of further salary by the government to three named federal employees, *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); and § 504 of the Labor-Management Reporting & Disclosure Act prohibiting members of the Communist Party from holding union office, *United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

Plaintiffs contend that the statute in question is directed at a specific group of persons, *i.e.,* young male students who require financial aid but cannot complete truthful statements of compliance. Defendants argue that § 1113 does not attach to specifically designated persons or groups because it does not describe persons in terms of *past conduct* but only present and

future actions, citing *Communist Party v. Subversive Activities Control Board,* 367 U.S. 1, 86, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961). Since the act is not intended to punish a class of persons who committed the past act of nonregistration and who can do nothing about it now, but instead to regulate the present and future conduct of those who wish to receive Title IV assistance, defendants contend, it is not a bill of attainder. Those who committed the past act of nonregistration could become eligible for funding by registering now.

Defendants' argument is not tenable. The Supreme Court soundly rejected the same argument over 100 years ago. In *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867), defendant argued that plaintiff could escape the bill's prohibitions presumably by making the required loyalty oath and that the bill was only intended to regulate the present and future conduct of those who wished to practice particular professions in Missouri. *Id.* at 297, 294. The Supreme Court nonetheless held that the amendment was a bill of attainder that inflicted punishment based on the past act of affiliation with the Confederacy. *Id.* at 320.[2]

Similarly, § 1113 bears no relationship to bona fide qualifications for educational funding but instead appears to be intended to reach the past act of nonregistration. To say that plaintiffs can escape the section's prohibitions by simply registering is to say that an allegedly unconstitutional law becomes valid by its mere enforcement; it also ignores the fact that males born after January 1, 1963 must register *within 30 days* of their eighteenth birthday or be subjected to prosecution for late registration. Section 1113 clearly singles out an ascertainable group based on past conduct.

2. The Court held that:
   [The clauses in the Missouri constitution] assume that there are persons in Missouri who are guilty of some of the acts designated .... *They are aimed at past acts, and not future acts.* They were intended especially to operate upon parties who ... had aided or countenanced the Rebellion ...; and they

were intended to operate by depriving such persons of the right to hold certain offices and trusts, and to pursue their ... avocations. *This deprivation is punishment; nor is it any less so because a way is opened for escape from it by the expurgatory oath.* *Cummings,* 71 U.S. (4 Wall) at 327 (emphasis added).

Plaintiffs further allege that § 1113 legislatively determines the guilt of this ascertainable group. Draft-age male students who fail to submit the statement of compliance are automatically denied financial aid, regardless of whether their nonregistration is intentional or innocent. The section thus assumes that all students who fail to submit the required statement possess a guilty intent to avoid registration requirements. Plaintiffs argue that a student may reasonably but mistakenly believe he is exempt from registration under one of the exemption categories; he would then be a nonregistrant but would not possess the specific intent required to punish him for the criminal offense of nonregistration under § 12 of the Military Selective Service Act, 50 U.S.C.App. § 462 (1981).

Plaintiffs also allege that the section inflicts punishment. The Supreme Court in *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) employed a three-part test to determine whether the act in question there constituted punishment.[3] That same test can be applied to § 1113 in these cases. First, the Court looked to a historical list of legislative punishments. The Court found that common punishments were imprisonment, banishment, and punitive confiscation of property. The Court noted that our own country's experience added another sanction to the list of impermissible legislative punishments: "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal." *Id.* at 474, 97 S.Ct. at 2806.

In the cases at hand, plaintiffs urge that § 1113 deprives students of the means to attend institutions of higher education and therefore effectively deprives them of the opportunity to pursue chosen careers. Plaintiffs point to *Cummings* where the Court said:

The deprivation of any rights, civil or political, previously enjoyed, may be punishment .... Disqualification from the

pursuits of a lawful avocation ... has been imposed as punishment.

....

The theory upon which our political institutions rest is, that all [persons] have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to everyone, .... Any deprivation or suspension of any of these rights for past conduct is punishment, ....

*Cummings,* 71 U.S. (4 Wall) at 320, 321–22.

Defendants, on the other hand, contend that denial of financial aid does not compare to any of the sanctions historically associated with bills of attainder. The fact that harm is inflicted by governmental authority does not make it punishment. *United States v. Lovett,* 328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252 (1946) (Frankfurter, J., concurring). Defendants argue that withholding federal assistance under Title IV is like the withholding of social security benefits from deportees illegally in this country that the Supreme Court upheld in *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In that case, the Court held that the sanction was the "mere denial of a noncontractual governmental benefit", *id.* at 617, 80 S.Ct. at 1376, and imposed no affirmative disability or restraint. Thus, defendants urge, § 1113 does not impose any punishment by withholding a benefit and cannot be classified as a bill of attainder.

The court is not persuaded by defendants' argument. While denial of federal financial aid is not a historical punishment, the court is not strictly confined to those sanctions that have been deemed punishment in the past. *See Nixon,* 433 U.S. at 475, 97 S.Ct. at 2806. If the statute in question prohibited students who could not prove they had registered for the draft from entering specific professions, *Cummings* would clearly dictate that the law be de-

---

**3.** The Court in that case found the act did not    inflict punishment.

clared unconstitutional. If the statute instead prohibited those students from attending any institution of higher education, the deprivation's punitive character would also be obvious. The fact that the challenged statute deprives students of the practical means to achieve the education necessary to pursue many vocations in our society means only that the congressional means of effecting the deprivation is less direct; the statute's result is still to punish students who cannot prove their innocence. In addition, the group affected—nonregistered students—is a group viewed by some as disloyal, just as those who had aided the confederacy were thought to be disloyal in post-Civil War times and just as Communists were thought to be disloyal in the Cold War era. *See, e.g., Cummings,* 71 U.S. (4 Wall) 277, 18 L.Ed. 356 (1867); *United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). Considering the importance of the opportunity to seek a college education in these times, deprivation of that opportunity based on past conduct of a group deemed to be disloyal seems to this court to be punishment.

*Flemming v. Nestor* does not mandate a different conclusion. In this court's view, it was not the characterization of the sanction as a "mere denial of a noncontractual governmental benefit" that dictated the Supreme Court's conclusion. Instead of engaging in semantic exercises similar to the "right" versus "privilege" discussions in the due process cases, the Court focused on whether the statute evinced a punitive purpose. The Court found that, "It is impossible to find in this meagre [legislative] history the unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down." *Id.* 363 U.S. at 619, 80 S.Ct. at 1377. Thus, the government's emphasis on the denial of financial aid as a denial of a mere benefit is misplaced.

The second element of the *Nixon* three-part test is a functional one. The Court in that case analyzed whether the law, viewed in terms of the type and severity of burdens imposed, reasonably could be said to further nonpunitive legislative purposes. Previous cases had listed a number of factors to use in a functional analysis, among them: whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter,* whether it promotes the traditional aims of punishment, whether the behavior to which it applies is already a crime, whether it has a rational alternative purpose, and whether it appears excessive in relation to that purpose. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963).

Plaintiffs claim that § 1113 acts as both a disability and restraint, that deprivation of benefits previously enjoyed has historically been regarded as punishment, that the law assumes nonregistrants possess guilty intent, that the law promotes the traditional aims of punishment by imposing retribution for past failure to register and by deterring future noncompliance, that the behavior it applies to is already a criminal offense under § 12 of the Selective Service Act, 50 U.S.C.App. § 462 (1981), that it has no rational educational purpose, and that it is excessively broad because it applies to those who have inadvertently failed to register as well as to those who have intentionally failed to register.

Defendants claim that the law passes the functional test because its rational nonpunitive purposes are (a) to encourage compliance with registration laws, (b) to promote a just allocation of scarce aid dollars, and (c) to assist the Selective Service in its enforcement of the draft registration laws.

The court believes that § 1113 fails the functional test. It imposes both a restraint and disability, assumes nonregistrants possess guilty intent, promotes the aims of retribution and deterrence, applies to behavior that is already a crime, and is excessively broad in relation to its alternative purposes. The court is also not persuaded that the purposes defendants allege are really alternative: under defendants' theory that the law does not punish nonregistration but encourages registration, every

"punishment" could be renamed an "encouragement" thereby escaping the Constitution's proscription on bills of attainder.

The third part of the *Nixon* three-part test is a motivational test inquiring whether the legislative record evinces a congressional intent to punish. 433 U.S. at 478, 97 S.Ct. at 2808. Plaintiffs allege that Congress clearly intended to punish nonregistrants by making them ineligible for federal financial aid. The bill's sponsor in the House, Representative Solomon, introduced the bill with the following language:

> There are some 700,000 young men in this country who have, for the most part, unintentionally failed to register, and I intend not only to offer this amendment to this legislation, but as other legislation comes down the pike, such as the jobs training bill, such as home loans ..., I intend to offer the same amendment *until every young man is deprived of Federal assistance unless he has obeyed the law*
> . . . .

128 *Cong.Rec.* H4757 (daily ed. July 28, 1982) (emphasis added). Other floor speakers evinced a similar punitive intent.[4] Representative Edgar in speaking against the bill said: "This amendment has the obvious primary objective of increasing the number of men registered .... *However, it also has a secondary, and more subtle, objective, which is to punish those individuals who do not register. Id.* at 4760 (emphasis added). Representative Goldwater observed that a nonregistrant "not only stands the chance of going to jail, but he also stands the chance of not receiving financial assistance for education, *which is just as harsh a penalty in terms of the boy's future." Id.* at 4761 (emphasis added). Other speakers pointed to the apparent unfairness to those who had registered of allowing nonregistrants to receive loans. The intent to legis-

latively determine guilt and inflict punishment, plaintiffs contend, is clear.

Defendants argue that Congress intended to encourage compliance with registration, not to punish nonregistrants. It is true that the record of congressional debate contains statements that the bill's purpose is to encourage compliance. 128 *Cong.Rec.* S4943 (daily ed. May 12, 1982) (statement of Sen. Hayakawa); *id.* at 4945 (statement of Sen. Jepsen). A thorough examination of the context of those statements, however, clearly reveals a punitive intent. Senator Hayakawa who sponsored the Senate bill said, "It is a real travesty when those who will not register can turn around and apply for ... educational benefits .... This [bill is] an important signal to every American that *this Congress will not tolerate any willful, blatant rejection of the responsibilities* which come with living in a free nation." *Id.* at 4944 (emphasis added).[5] Only Senator Durenberger spoke against the bill in the Senate, arguing that criminal sanctions already provided the means by which to punish nonregistrants and calling the measure a case of overkill. *Id.*

In summary, the record in both houses of Congress shows an obvious intent to punish nonregistrants. Even the addition of an intent to encourage compliance with registration cannot save this law: deterrence of future wrongdoing is a traditional punitive aim. As the court has already observed, under defendant's view, each statute punishing one act could be recast as encouraging another act, thereby escaping scrutiny. Such an interpretation would render our Constitution's prohibition on bills of attainder meaningless.

The court concludes that plaintiffs have shown a probability of success on the merits of their claim that § 1113 legislatively determines the guilt of and inflicts punish-

---

**4.** Representative Mitchell, for example, said, "If young men do not think enough of their country to register to defend it, I do not see any reason at all why they should get benefits from that country." *Id.* Representative Montgomery noted, "[I]t is a felony, they have violated the law, and they are not entitled to these educational benefits." *Id.*

**5.** *See also* statement of Senator Tower, "I do not know why anyone should be permitted to claim the benefits ... financed [by] the taxpayers of this country if they are not prepared simply to register ...." *Id.* at 4945.

ment on an identifiable group without the protections of a judicial trial. This court therefore finds that plaintiffs have demonstrated a probability of success on the merits of their claim that § 1113 constitutes a bill of attainder in violation of art. I, § 9, cl. 3 of the United States Constitution.

B. Fifth Amendment

Plaintiffs also allege that § 1113 violates their fifth amendment privilege against self-incrimination. The fifth amendment provides that no person "shall be compelled in any criminal case to be a witness against himself ...." The fifth amendment has been characterized as an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956) (quoting *Griswold, The Fifth Amendment Today* (1955) 7). The policies underlying the amendment have been expressed as follows:

> It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitional system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load" ...; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life" ...; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) (citations omitted). This important constitutional protection has been interpreted liberally, in keeping with the amendment's spirit. *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956); *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964 (1955).

■ While the amendment by its terms applies to criminal cases, it is clear that the "privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory" *Murphy,* 378 U.S. at 94, 84 S.Ct. at 1611 (White, J., concurring). The availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but on the nature of the statement and the exposure it invites. *In Re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967) (holding that privilege is available in juvenile delinquency proceedings).[6]

■ The privilege extends not only to information that would in itself be incriminating, but also to answers that would furnish a link in the chain of evidence to prosecute. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The privilege protects any disclosures that the witness may reasonably apprehend could be used in a criminal prosecution or could lead to other evidence that might be used to prosecute. *Murphy,* 378 U.S. at 94, 84 S.Ct. at 1611 (White, J., concurring).

Plaintiffs contend that § 1113 violates the fifth amendment in two ways: first, the statute penalizes those who assert the

---

**6.** *See also Lefkowitz v. Turley,* 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973), holding that the privilege was available in the con-

text of an official inquiry into the job performance of a public contractor.

privilege by denying them access to Title IV funds, impermissibly burdening exercise of the privilege; and second, the statute's scheme of operation serves to incriminate those who choose to assert the privilege. Plaintiffs argue that denial of federal financial assistance to those students who assert their fifth amendment privilege is an impermissible burden on exercise of that privilege. Plaintiffs point to a series of Supreme Court cases in which denial of various rights for asserting the privilege has been invalidated. *See, e.g., Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1, (1977) (divesting political officeholder of his office and imposing a five-year ban on holding any public or party office for refusal to waive his constitutional immunity in a grand jury investigation of his conduct held unconstitutional); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (denying public contractors the right to contract with the government for five years upon their refusal to sign waivers of immunity held unconstitutional); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (requiring police officers in an inquiry by the state attorney general concerning the fixing of traffic tickets to respond to questions or face removal from office held unconstitutional); *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (disbarring a lawyer for failure to honor a *subpoena duces tecum* and to testify at the judicial inquiry held unconstitutional).

Plaintiffs also contend that the statute's scheme of operation incriminates those students who assert the privilege. Any student who provides a false statement of compliance will subject himself to prosecution for perjury. 20 U.S.C. § 1097 (1982). Nonregistration is also a criminal offense. 50 U.S.C.App. § 462 (1981). In addition, the statute provides that the Secretary of Education, in agreement with the Director of the Selective Service, will prescribe methods for verifying statements of compliance. "Such methods may include requiring institutions of higher education to provide a list to the Secretary of Education or to the Director of persons who have submitted such statements of compliance." Department of Defense Authorization Act of 1983, Pub.L. No. 97–252, § 1113(f)(3), 96 Stat. 748 (1982) (to be codified at 50 U.S.C. § 462(f)). Plaintiffs argue that the Selective Service System will be put on notice that a student is in violation of the law once a student asserts his fifth amendment privilege.

Defendants contend that § 1113 does not violate the fifth amendment because students are not *compelled* to provide incriminating information. Where an individual retains a bona fide, voluntary choice whether to furnish information to the government, defendants maintain, the privilege does not attach. Defendants say that plaintiffs may choose not to apply for Title IV assistance and that the economic consequences of that decision do not change its voluntary nature.

The court finds that plaintiffs have demonstrated a probability of success on the merits of their claim that § 1113 violates the fifth amendment's protection against self-incrimination. The amendment's protection extends to administrative proceedings like the one envisioned by this statute. *See* cases cited at 946, *supra.* The information required is clearly incriminating to nonregistrants and could also furnish a link in the chain of evidence used to prosecute the nonregistrant. In *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 77, 86 S.Ct. 194, 198, 15 L.Ed.2d 165 (1965), petitioners were Communist Party members who had been ordered to register and had failed to do so. The Court found that the risks of incrimination to petitioners by registering were obvious. The form required an admission of membership in the Communist Party; that admission could be used to prosecute the registrant under at least two federal criminal statutes.

■ The central standard for the application of the privilege has been "whether the claimant is confronted by substantial and 'real,' not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968). Petitioner in *Marchetti*

was convicted for evading payment of an occupational tax on wagers and for failure to comply with a statute requiring those liable for the tax to register and to supply detailed information on forms to the Internal Revenue Service. The statute required the IRS to provide to prosecuting officers a list of those who had paid the occupational tax. Petitioner contended that the statute violated the fifth amendment. The Court agreed with petitioner and found that he was confronted by a comprehensive system of prohibitions on wagering, yet was required to provide information that he might reasonably suppose would be available to prosecuting authorities and that would surely prove a significant link in a chain of evidence tending to establish his guilt. Wagering, the Court said, was an area permeated with criminal statutes and those engaged in wagering were a group inherently suspect of criminal activities. *Id.* at 47, 88 S.Ct. at 702. *See also Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). *But see California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).

█  In the cases at hand, plaintiffs must identify themselves in the Title IV aid application process as nonregistrants under the Selective Service System's registration requirements. The law allows this information to be provided to the Director of the Selective Service System and directs that the Director work with the Secretary of Education to verify compliance statements. While the government has adopted a "passive enforcement" system under which identities of nonregistrants are not actively sought, it appears that the Service expects to implement soon an "active" enforcement program based on access to Social Security records.[7] *United States v. Eklund,* 551 F.Supp. 964, 968 (S.D.Iowa 1982). It takes no great stretch of the imagination to discern how plaintiffs' identification of themselves as nonregistrants could incriminate them or provide a significant link in the chain of evidence tending to establish their guilt.

The court also believes that the information required by § 1113 is compelled. Defendants' argument that plaintiffs can "choose" not to apply for benefits, thereby avoiding a fifth amendment problem, has been consistently rejected by the Supreme Court. In *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), the Court discussed *Lewis v. United States,* 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), which had held that an occupational tax on wagering did not violate the fifth amendment because it merely imposed on the gambler the initial choice of whether he wished to gamble. The gambler need not register or pay the tax if he ceased to gamble. There was, the Court said, no constitutional right to gamble. The Court in *Marchetti* found that reasoning no longer persuasive. "The question is not whether petitioner holds a 'right' to violate state [wagering] law, but whether, having done so, he may be compelled to give evidence against himself." *Marchetti,* 390 U.S. at 51, 88 S.Ct. at 704.

As the Court in *Garrity v. New Jersey,* 385 U.S. 493, 498, 87 S.Ct. 616, 619, 17 L.Ed.2d 562 (1967) noted "where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." The Court held in that case that threatened loss of employment for refusal to speak in an attorney general's investigation constituted compulsion. *Id.* at 497, 87 S.Ct. at 618. In *Spevack v. Klein,* 385 U.S. 511, 514, 87 S.Ct. 625, 627, 17 L.Ed.2d 574 (1967), the Court said that the fifth amendment grants to a person the right to remain silent until he chooses to speak in the unfettered exercise of his own will and to suffer no penalty for such silence. A penalty, the Court said, is "the imposition of any sanction which makes assertion of the ... privilege 'costly.'" *Id.* at 515, 87 S.Ct. at 628. In that case, the threat of disbarment, the loss of profession-

---

7. *See* 50 U.S.C.App. § 462(e) (1981) allowing the President to require the Secretary of Health and Human Services to furnish various information to the Director, including names, addresses and social security numbers.

al standing, and loss of livelihood were held to be powerful forms of compulsion to make a lawyer relinquish the privilege. Loss of political office and of the right to contract with the government have also been held to constitute compulsion. *See Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

Contrary to defendants' implication in this case, economic consequences are relevant in assessing the presence of compulsion. In *Lefkowitz v. Cunningham,* 431 U.S. at 806–07, 97 S.Ct. at 2136, the Court observed that while earlier cases were concerned with penalties having a substantial economic impact, "the touchstone of the Fifth Amendment is compulsion, and *direct economic sanctions* and imprisonment are *not the only penalties* capable of forcing the self-incrimination . . . ." (emphasis added.) The Court then interpreted the amendment's protection broadly by finding threatened loss of a powerful political office and diminished reputation inherently coercive. The Court buttressed those consequences with a finding of grave economic consequence.

The cases defendants rely on for the propositions that the privilege does not attach absent compulsion and that filing for financial aid is voluntary are distinguishable.[8] It is true that the Eighth Circuit in *United States v. Warinner,* 607 F.2d 210 (8th Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980) found that filing a W–4E form was a voluntary act. The court noted that the taxpayer was not obliged to file the form but could have filed a different form, paid his tax and then filed for a refund. Loss of use of the money during that time was not sufficient to change the essentially voluntary nature of the act.

In contrast, plaintiffs here have no option of receiving federal financial assistance in another way. To receive the assistance they need to attend a college or university for the 1983–84 school year under any of the programs funded by Title IV, they must file a statement of compliance. Students who cannot complete their educations without such assistance have no more "choice" whether to file than did the gambler who could "choose" not to gamble. While such students concededly are not being summoned by grand juries or attorney generals' investigations, as were persons in many of the Supreme Court cases finding compulsion, students who need financial assistance are forced to participate in an administrative process, perhaps even a hearing, where they are asked to assist the government in its investigation of their registration status. As the court discussed in part I, *supra,* denial of the opportunity to pursue one's education and chosen vocation is a severe penalty in this society. It is this court's opinion that denial of educational assistance is a sanction that makes assertion of the privilege costly, thereby compelling self-incrimination.

Defendants also rely on *Field v. Brown,* 610 F.2d 981 (D.C.Cir.1979), where regulations requiring retired military officers to file a form saying they were not engaged in

---

**8.** *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) involved seizure of plaintiff's business records; plaintiff was never required to say anything, the records were seized by law enforcement personnel, and they were authenticated by prosecution witnesses, not the petitioner. The Court said the fifth amendment adheres to the person, not to information that may incriminate him. *Id.* at 473, 96 S.Ct. at 2744. At the time the records were made, petitioner was not subject to the cruel trilemma of self-accusation, perjury or contempt.

*Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) is also inapposite. In that case, the Court said enforcing sum-

monses against taxpayers' *lawyers* did not violate the fifth amendment because they did not compel the *taxpayers* to do anything. The Court said it had held repeatedly that the fifth amendment is limited to protecting compulsion exerted on the person asserting the privilege. *Id.* at 397, 96 S.Ct. at 1574.

*Diebold v. Civil Service Commission,* 611 F.2d 697 (8th Cir.1979), relied on by defendants, is also easily distinguishable. In that case, plaintiff offered no proof that he would be penalized for invoking the fifth amendment or even that he would be required to testify. There was simply no evidence that he would be faced with the dilemma of surrendering his job or his privilege. *Id.* at 700.

sales to the armed services were upheld against fifth amendment challenges. No criminal penalties would follow failure to file, but an investigation for conflict of interest would normally result when the form was not filed. That investigation could develop evidence of criminal conduct. While the form provided information that enabled authorities to reduce pension payments to retirees already holding federal employment, that function was characterized as a regulatory one. The court said that retired regular officers were a distinguished and honorable class, not a highly selective group inherently suspect of criminal activities. Retired officers had a bona fide, voluntary choice whether to complete the form or not.

The court finds that the cases at hand are distinguishable. Section 1113 does not apply even-handedly to all members of a distinguished group but instead is directed at a small group of likely violators. While not all nonregistrants are college students, among young male college students there are likely to be a number of nonregistrants. Like the gambler in *Marchetti,* a nonregistrant college student who applies for aid must unmistakably identify himself as a nonregistrant. In addition, the court is not persuaded that *Field* was correctly decided. The withholding of retirement pay and referral of the matter to other federal agencies seem to be penalties on the exercise of the privilege. The fact that the government already had the authority to investigate does not make the information compelled less incriminating: "The judgment as to whether a disclosure would be 'incriminatory' has never been made dependent on an assessment of the information possessed by the Government at the time of the interrogation; the protection of the privilege would be seriously impaired if the right to invoke it was dependent on such an assessment . . . ." *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 81, 86 S.Ct. 194, 200, 15 L.Ed.2d 165 (1965).

In summary, the court finds that plaintiffs have demonstrated a probability of success on the merits of their claim that § 1113 violates the fifth amendment privilege against self-incrimination.

The court finds it unnecessary to decide whether the challenged statute violates the equal protection component of the fifth amendment's due process clause. The court also does not reach the merits of the Privacy Act and Presidential Proclamation claims.

IV.  The Public Interest

The fourth *Dataphase* factor to consider in deciding whether to issue a preliminary injunction is the public interest. The court has already determined that plaintiffs have demonstrated a probability of success on the merits of their challenge to the law's constitutionality. Enforcement of a law likely to be found unconstitutional is not in the public interest. The court finds that the public interest weighs in favor of the issuance of the preliminary injunction sought by plaintiffs.

Neither the court's ultimate conclusion that a preliminary injunction will issue nor anything set forth in this opinion should be construed as condoning noncompliance with the valid draft registration law of this nation, nor as affording solace to those who willfully violate that law by failing to register. On the contrary, this court is firmly of the opinion that those persons subject to the draft registration law owe their country a legal duty to comply with that law in all respects. The issue here before the court turns not on whether the registration law should be enforced, but in what manner. The Military Selective Service Act, 50 U.S. C.App. § 462 (1981), provides for a maximum penalty of five years in prison and/or a $10,000 fine for those convicted of violating its provisions. No doubt, as with the other criminal statutes of this nation, the Department of Justice and the United States attorneys will vigorously enforce the registration act and appropriate sentences will be imposed upon those who are convicted of willful violation of that law.

Accordingly,

IT IS ORDERED That plaintiffs' motions for a preliminary injunction are granted.

IT IS FURTHER ORDERED That an injunction issue, without security therefor, in the form attached hereto.