877 F.2d 1167
 UNITED STATES of America ex rel. D'AGOSTINO, Dominick
v.
KEOHANE, Patrick, Warden, U.S. Northeastern Penitentiary;
Quinlan, J. Michael, Director U.S. Bureau of
Prisons; and Baer, Benjamin F.,
Chairman U.S. Parole Commission.
Appeal of Dominick D'AGOSTINO.
 No. 89-5021.
 United States Court of Appeals,
Third Circuit.
 Argued May 18, 1989.
Decided June 14, 1989.
 
 Louise O. Knight, (argued), Clement & Knight, Lewisburg, Pa., for appellant.
 Richard K. Preston, (argued), Michael A. Stover, Gen. Counsel, Karen Sedora Morgan, U.S. Dept. of Justice, U.S. Parole Com'n, Office of the Gen. Counsel, Chevy Chase, Md., James J. West, U.S. Atty., Scranton, Pa., Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., for appellees.
 Before GIBBONS, Chief Judge, MANSMANN and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this appeal from the dismissal of petitioner's writ of habeas corpus we are faced with the necessity of interpreting Sec. 235(b)(3) of the Sentencing Reform Act of 1984[1] to determine whether an individual who is released prior to the day before the Parole Commission expires in 1992 is within the jurisdiction of the Commission and therefore guaranteed a release date within the appropriate guideline range. This issue is one of first impression for us, although the Courts of Appeals for the Second and for the Fifth Circuit have decided the question. Because we conclude as did our sister courts that Sec. 235(b)(3) is a "wind-up" provision and does not guarantee an individual's release within the guideline range, we affirm the district court's dismissal of the petition for writ of habeas corpus. In addition, we note tht the petitioner's request for habeas relief that the court order the Parole Commission to hold a hearing to reduce his offense severity category in light of the new property value ranges, and thereby order his release, is now moot since the Commission sua sponte granted a hearing and rendered a decision.
 
 I.
 
 2
 The petitioner, Dominick D'Agostino, was convicted of RICO violations stemming from mail fraud, interstate transportation of money obtained through extortion, and bribery of public officials. He received an aggregate sentence of 13 years. The Parole Commission assigned D'Agostino a salient factor of 10 and placed him in an offense severity category of 6 because he had directed a racketeering enterprise which resulted in fraud exceeding $500,000, knowingly transported $300,000 in checks which had been extorted from the victim, and engaged in bribery of public officials. Indeed, in its recitation of facts attached to the presentencing report, the government described incidents of bribery and extortion involving the Orlando Construction Company, founded in 1974 by the government's witness Rudolph Orlandini, D'Agostino, and several others, which was used to obtain money through fraudulent change orders and to make payoffs to city and county officials. These payoffs totalled well over $600,000.
 
 
 3
 The category 6 designation placed D'Agostino in the guideline range of serving 40-52 months prior to his initial parole hearing. D'Agostino began serving his sentence in 1983. His initial parole hearing was held on December 9, 1987. The Commission denied parole because it determined that a longer range was necessary due to the extensive and sophisticated nature of the criminal organization which had "systematically corrupted public officials and defrauded the public over a six year period."
 
 
 4
 After D'Agostino received notice of the denial of his parole, he appealed to the National Appeals Board. Shortly thereafter, the Federal Parole Commission published revised categories in the Federal Register in which the property amount involved for a grade of category 6 was increased to more than one million dollars. Category 5 encompassed values ranging from $200,000 to $1,000,000. The National Appeals Board denied the request for immediate parole and responded that D'Agostino's grade would remain at category 6 because he "directed a racketeering enterprise which resulted in fraud exceeding $1 million."
 
 
 5
 D'Agostino filed his petition for writ of habeas corpus on July 29, 1988 alleging that the Parole Commission violated the Sentencing Reform Act, specifically Sec. 235(b)(3), by failing to set a release date within the parole guideline range for his offense severity. In addition, he argued that the Commission's decision to increase the dollar amount of the fraud from $600,000 to over $1 million without a hearing was arbitrary, capricious and a violation of due process. He sought two remedies, an immediate release under Sec. 235(b)(3) because he had served his sentence of 40-52 months, or in the alternative, an order from the courts requiring the Commission to hold a hearing and reduce his offense severity to Category 5 and order his immediate release.
 
 
 6
 While the petition was under consideration before the district court, the Parole Commission sua sponte issued a notice of a special reconsideration hearing to consider D'Agostino's offense severity in light of amendments to the sentencing guidelines. D'Agostino moved to have the hearing stayed pending decision on the writ. The district court denied the motion to stay the appeals board hearing. The court concluded that the hearing would grant D'Agostino the opportunity to challenge the findings of the Commission's decision to deny the reduction of his offense severity rating which was, in part, the gravamen of his petition. The district court also dismissed the petition for writ of habeas corpus, finding that Sec. 235(b)(3) did not require the Commission to set D'Agostino's release date prior to the statutory release date of July 16, 1992. D'Agostino appeals.
 
 
 7
 Our review of the district court's decision to dismiss the petition for writ of habeas corpus to enable the Parole Commission to reconsider D'Agostino's case de novo is based on an abuse of discretion standard. Zannino v. Arnold, 531 F.2d 687 (3d Cir.1976). The district court's decision dismissing the petition for writ of habeas corpus, resting on an interpretation of Sec. 235(b)(3) of the Sentencing Reform Act, is subject to plenary review since it involves an interpretation of legal concepts. United States v. Adams, 759 F.2d 1099 (3d Cir.1985).
 
 II.
 
 8
 First, we address D'Agostino's contention that the Parole Commission violated Sec. 235(b)(3) of the Sentencing Reform Act by failing to set a release date within the guideline range of 40-52 months for his category 6 severity offense. In addition, or as a subissue, D'Agostino contends that if the Commission bases its decision to deny parole and to require the full statutory sentence to be served upon Sec. 4206 (providing for denial for good cause), this is an unconstitutional action in violation of the ex post facto clause since the amendment of Sec. 235 permitting the departure became effective in December 1987, after D'Agostino had served one-third of his sentence.
 
 
 9
 The government counters D'Agostino's claim that Sec. 235(b)(3) requires his release within his guideline range by contending that Sec. 235(b)(3) of the Act was to be a phase-out or transition section intended to provide authority to the Commission to complete a final round of parole decisions prior to the expiration of its authority on November 1, 1992. We must determine whether, as D'Agostino contends, Sec. 235(b)(3) guarantees a release date within a petitioner's applicable guideline range or whether, as the government contends, it is merely a wind-up provision which does not apply to D'Agostino.
 
 A.
 
 10
 It is well settled that the Sentencing Reform Act abolished the United States Parole Commission and repealed the federal parole statutes.[2] The purpose of the prior system in effect, set forth in the general statement to the Sentencing Reform provisions of Title II, Pub.L. 98-473, was clearly rehabilitative.
 
 
 11
 [T]he sentencing provisions of current law were originally based on a rehabilitation model in which the sentencing judge was expected to sentence a defendant to a fairly long term of imprisonment. The defendant was eligible for release on parole after serving one-third of his term. The Parole Commission was charged with setting his release date if it concluded that he was sufficiently rehabilitated. At present, the concepts of indeterminate sentencing and parole release depend for their justification exclusively upon this model of "coercive" rehabilitation--the theory of correction that ties prison release dates to the successful completion of certain vocational, educational, and counseling programs within the prisons.
 
 
 12
 Recent studies suggest that this approach has failed....
 
 
 13
 S.Rep. No. 98-225, reprinted at 1984 U.S.Code Cong. & Admin.News 3182, 3220, 3223 (1985) (legislative history to Title II, Pub.L. 98-473).
 
 
 14
 The major concern of the sponsors of the new sentencing bill was the lack of consistency in sentencing and in granting parole which led to great disparities.[3] This disparity could be traced directly to the "unfettered discretion" that current law conferred on the judges and the parole boards who imposed and implemented the sentence. 1984 U.S.Code Cong. & Admin.News at 3221. It is well known that there are different sentencing philosophies. These range from retribution and punishment of the wrong-doer to deterrence of other wrong-doers. In addition, some judges believe the individual should be rehabilitated while in prison and returned to society as a productive member, while others feel that the primary purpose of the criminal justice system is to protect society. Each individual judge's sentencing philosophy factors into his decision of an appropriate sentence. See generally A.W. Campbell, Law of Sentencing, 21-41 (1978). The goal of the Sentencing Reform Act was to provide a system of sentencing which was consistent, fair and certain.
 
 
 15
 In order to achieve this goal, Congress created a sentencing guideline system which was intended "to treat all classes of offenses committed by all categories of offenders consistently." 1984 U.S.Code Cong. & Admin.News at 3234. The sentencing guidelines system was not meant to remove all discretion from the sentencing judge, but rather, it was to act as a guide while deciding on the appropriate sentence. Departure from the guidelines was permitted if aggravating or mitigating circumstances were present in the case which had not been adequately considered in the formulation of the guidelines. Id.
 
 
 16
 Thus, with the elimination of the disparity in the sentencing system and the introduction of certainty as to the length of the sentence, both the prisoner and the prison officials could develop a realistic goal as to the rehabilitation to be achieved during the service of the term. Id. at 3240. With the federal sentencing laws adhering to a consistent sentencing philosophy, each participant would know the purpose to be achieved by each particular sentence. Id. at 3242. The sponsors realized that changing the "arbitrary and capricious method of sentencing will not be a panacea for all of the problems which confront the administration of criminal justice, but it will constitute a significant step forward." Id. at 3348.
 
 
 17
 Section 235 of the Sentencing Reform Act of 1984 set the effective date of the title as occurring two years from the first day of the first month following the date of enactment.[4] It was apparent that the drafters of the Sentencing Reform Act intended that
 
 
 18
 [t]he title [would] apply to any offense or other event occurring on or after the effective date. A sentence imposed before the effective date of the guidelines as to an individual imprisoned or on probation or parole on that date would not be affected by this title. As to an offense committed prior to the effective date, the preexisting law will apply as to all substantive matters including the imposable sentence.
 
 
 19
 1984 U.S.Code Cong. & Admin.News at 3372.
 
 
 20
 The Parole Commission and current law provisions were to remain in effect for five years from the effective date of the title. During this five year period, the Commission was authorized to deal with sentences imposed under the pre-Act practices and the lengths of sentences, parole and good time statutes would remain in effect as to any individual sentenced before the new Act. See 1984 U.S.Code Cong. & Admin.News at 3372.[5]
 
 
 21
 D'Agostino was convicted of separate counts in March and in October of 1982 of crimes committed between 1974 and 1978. Clearly the old sentencing provisions apply to him. As such, 18 U.S.C. Sec. 4206(c),[6] which permits the Parole Commission to deny parole within the guidelines if it determines there is good cause, applies to D'Agostino because the legislators intended that a "sentence imposed before the effective date of the guidelines as to an individual imprisoned or on probation or parole on that date would not be affected by" the Sentencing Reform Act. 1984 U.S.Code Cong. & Admin.News at 3372.
 
 
 22
 Recognizing that most individuals sentenced under the old system would be released during the five year transition period before the Commission expired, the sponsors were concerned with the fate of those individuals who would not be released by the expiration of the Commission's tenure. It was those individuals who might "fall through the cracks" if no release date was set prior to the expiration of the Commission's term. Consequently, the Commission was directed to set a release date for individuals sentenced under the old system who would still be incarcerated on the date prior to the expiration of the Commission. See 1984 U.S.Code Cong. & Admin.News at 3372. Since D'Agostino's statutory release date is set for July 16, 1992,[7] he will fall outside the jurisdiction of the Parole Commission on October 30, 1992, which is the day prior to the expiration of the Commission's term. Thus, by its very terms as well as by its obvious intent, Sec. 235(b)(3) does not apply to D'Agostino.
 
 
 23
 Although we have not previously interpreted Sec. 235(b)(3), two other courts of appeal have interpreted the intent of the section. In Romano v. Luther, 816 F.2d 832 (2d Cir.1987), the Court of Appeals for the Second Circuit held that Sec. 235(b)(3) "requires the Parole Commission to set parole release dates within applicable guideline ranges only for prisoners who will be in prison October 30, 1992, the day before the end of the five-year transition period...." 816 F.2d at 842. (Emphasis added.) While so holding, the court noted that "the subsection is a 'winding-up' provision that will provide the certainty of release within the appropriate guideline range to those for whom the Parole Commission, prior to its abolition, might otherwise have either taken no action or set a parole date beyond their guideline ranges." 816 F.2d at 840.
 
 
 24
 Additionally, the Court of Appeals for the Fifth Circuit, relying on Romano, supra, held in Lightsey v. Kastner, 846 F.2d 329 (5th Cir.1988), that the Commission is not "required to set a release date earlier than a point in time early enough to permit an administrative appeal to the Commission prior to the date on which the Parole Commission would cease to exist." 846 F.2d at 333. Under this reading, Sec. 235(b)(3) is inapplicable to those who would already be released at the time Sec. 235(b)(3) required the Commission to act.
 
 
 25
 Thus, the opinions of two courts of appeals also lend persuasive authority to the district court's determination that Sec. 235(b)(3) does not apply to D'Agostino and does not oblige the parole commission to set a release date within the guideline range.
 
 
 26
 D'Agostino argues that the Romano court's interpretation of Sec. 235(b)(3) is based on faulty reasoning because Congress could not have intended for pre-guidelines prisoners whose mandatory release dates fall before October 30, 1992 to fall through the cracks and fail to receive the benefit of being paroled within their guideline ranges and of having sentencing disparity eliminated. In other words, D'Agostino reasons, if the intent of the Sentencing Reform Act of 1984 was to eliminate disparity in sentencing for all pre-guideline offenders, then the Act is frustrated if he is not released within the guideline range. While we note that this is a very appealing argument, we nevertheless find it unpersuasive.
 
 
 27
 Following the rationale of the Courts of Appeals for the Second Circuit in Romano and the Fifth Circuit in Lightsey, we hold that Sec. 235(b)(3) did not vest D'Agostino with the benefit of a guaranteed release date within the parole guideline range. See Romano, 816 F.2d at 840-42, and Lightsey, 846 F.2d at 333. We find that the district court properly concluded that Sec. 235(b)(3) did not apply to D'Agostino because he would not be within the jurisdiction of the Parole Commission on October 30, 1992. Consequently, since Sec. 235(b)(3) does not apply to D'Agostino, the Commission is not obliged to set a release date within the guideline range.[8]
 
 B.
 
 28
 D'Agostino also challenges the amendment to Sec. 235(b)(3) which permits the Commission to set release dates outside the guideline range pursuant to 18 U.S.C. Sec. 4206 for good cause.[9] D'Agostino contends that the amendment retroactively changes Sec. 235(b)(3), thereby eliminating his right to parole within the guideline range which amounts to an ex post facto law.[10]
 
 
 29
 The ex post facto prohibition forbids Congress or the states from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981), quoting Cummings v. Missouri, 4 Wall. 277, 325-26, 18 L.Ed. 356 (1867). Two critical elements must be present for a criminal or penal law to be found ex post facto: it must be retrospective, i.e., applying to events prior to its enactment, and it must disadvantage the offender affected by it. Weaver, 450 U.S. at 29, 101 S.Ct. at 964. In Weaver, the Supreme Court was faced with a challenge to a Florida statute which repealed an earlier statute and reduced the amount of good time credits a prisoner could earn to reduce his sentence. The prisoner affected had committed the offense at the time the old statute was in effect. The Court found the new statute an unconstitutional ex post facto law because it made more onerous the punishment for crimes committed before its enactment by constricting the inmate's opportunity for early release.
 
 
 30
 Assuming arguendo that Sec. 235(b)(3) applied to D'Agostino (we have already concluded it does not), an ex post facto analysis reveals that although the law is retrospective, it does not disadvantage D'Agostino. The reason D'Agostino is not disadvantaged by the application of the amended Sec. 235(b)(3) is that had Sec. 235(b)(3) never been enacted as a transition statute, D'Agostino would still have been subject to the dictates of 18 U.S.C. Sec. 4206 and the provision permitting the Commission to set release dates outside the guideline range for "good cause." Thus D'Agostino is not disadvantaged by the amendment and the Parole Commission had the statutory authority to deny a release date within the guideline range for good cause.
 
 III.
 
 31
 D'Agostino's second argument, that the district court erred in dismissing the petition for writ of habeas corpus to allow the Appeals Board to hold a reconsideration hearing and in refusing to grant a stay of the Appeals Board reconsideration hearing, is now moot. The district court dismissed the petition, partly due to its decision that Sec. 235(b)(3) did not apply to D'Agostino, but essentially because the Parole Commission's intervening action in granting a reconsideration hearing negated the gravamen of D'Agostino's petition wherein he alleged that the Commission's refusal to reduce his offense severity rating was arbitrary, capricious and not in accordance with the law.
 
 
 32
 In Arias v. U.S. Parole Commission, 648 F.2d 196 (3d Cir.1981), we reiterated our policy of following the doctrine of exhaustion when we stated that a federal prisoner ordinarily may not challenge a parole decision until he has exhausted all available administrative remedies. 648 F.2d at 199. While not factually on point because here the Commission's sua sponte grant of a hearing came after D'Agostino's petition was filed, Arias lends support to the district court's action for several reasons. As we stated in Arias, exhaustion serves many purposes:
 
 
 33
 (1) judicial review may be facilitated by allowing the appropriate agency to develop a factual record and apply its expertise; (2) judicial time may be conserved because the agency might grant the relief sought; and (3) administrative autonomy requires that an agency be given an opportunity to correct its own errors.
 
 
 34
 648 F.2d at 199. We concur in the district court's reasoning that "[p]etitioner will be able to challenge the Parole Commission's final position in his case at that time." U.S. ex rel. D'Agostino v. Keohane, Civ. No. 88-1148 (M.D.Pa. Nov. 30, 1988) slip op. at 9.
 
 
 35
 Since the substance of D'Agostino's complaint is that the Commission violated his due process by increasing the property amount without allowing him to challenge the decision, the Commission's grant of a reconsideration hearing gave D'Agostino the very opportunity he claims to have been denied.[11] The reasons we stated in Arias which argue in favor of allowing the agency to correct its own errors are the very reasons federal courts require state prisoners to exhaust state remedies, thus permitting state courts an opportunity to correct their own mistakes.
 
 
 36
 D'Agostino further contends that the Parole Commission's reopening of his case sua sponte is indicative of bad faith such that we should not give deference to the Commission's actions. In so arguing, D'Agostino specifically relies on language in Arias where we stated that
 
 
 37
 [h]ad appellant alleged and proven bad faith on the part of the Commission, we would have been inclined to find that all administrative remedies had been exhausted inasmuch as the Commission's regulations deem a decision of the National Appeals Board to be final and, consequently, administratively unappealable. 28 C.F.R. Sec. 2.26(c) (1980).
 
 
 38
 648 F.2d at 199, n. 3.
 
 
 39
 At oral argument, counsel for D'Agostino outlined the best case for showing a lack of good faith on the part of the Parole Commission: 1) in response to D'Agostino's first appeal to the Appeals Board the Commission considered his status under the revised property guidelines, then gave the reason for the sua sponte reconsideration as being a check on whether the revised guidelines applied, and 2) in the government's response to the habeas corpus petition it failed to mention the Parole Commission's decision to grant a reconsideration hearing. We fail to see how the granting of a hearing to allow D'Agostino to challenge the very actions he alleges in his habeas petition to be arbitrary, capricious and not in accordance with the law amounts to bad faith. He has been granted the due process which he alleged he has been denied.[12]
 
 IV.
 
 40
 Having concluded that Sec. 235(b)(3) did not require the Commission to set D'Agostino's release date within parole guidelines and noting that the rehearing granted by the Commission gave D'Agostino the opportunity to challenge the Commission's actions, the district court properly dismissed the petition for writ of habeas corpus. We will affirm the district court's decision.
 
 
 
 [1]
 Pub.L. 98-473, 98 Stat. 1837 (1984), amended by Pub.L. 99-217, Sec. 4, 99 Stat. 1728 (1985), and by Pub.L. 100-182, Sec. 1, 101 Stat. 1266 (1987)
 
 
 [2]
 Senator Strom Thurmond described the Comprehensive Crime Control Act of 1984 as "the greatest crime package [he] had witnessed in [his] 30 years in the Senate." However, he urged that "Title II [Sentencing Reform Act] of the comprehensive crime package illustrates that even a great idea can be improved." At the Senator's request, a more detailed description of H.J.Res. 648 (which became Pub.L. 98-473 upon its passage October 12, 1984) was entered into the record. The description of the sentencing reform provisions stated:
 COMPREHENSIVE CRIME PACKAGE-TITLE II OF H.J. RES. 648
 * * *
 II. Sentencing Reform would: establish a determinate sentencing system with no parole and limited "good time" credits; promote a more uniform sentencing by establishing a commission to set a narrow sentencing range for each Federal criminal offense; require courts to explain in writing any departure from sentencing guidelines; and authorize defendants to appeal sentences harsher, and the Government to appeal sentences more lenient, than the sentencing commission guidelines.
 
 
 [130]
 Cong.Rec. S14207 (daily ed. October 11, 1984)
 
 
 [3]
 An excellent example of the disparity can be found in the figures for two different districts within the same state. A chart reproduced from O'Donnell, Churgin and Curtis, "Toward a Just and Effective Sentencing System: Agenda for Legislative Reform" (Praeger, 1977) reproduced at 1984 U.S.Code Cong. & Admin.News at 3228 indicated that the average length of sentence in months for homicide and assault was 79 for the Northern District of California while it was 190 months for the Central District. The national average was 102
 
 
 [4]
 This two year period was extended another year by the Sentencing Reform Amendments Act of 1985, Pub.L. 99-217, Sec. 4, 99 Stat. 1728 (1985)
 
 
 [5]
 Subsection (b) retains the Parole Commission and current law provisions related to parole in effect for the five-year period after the effective date of this title in order to deal with sentences imposed under current sentencing practices. It also keeps the provisions as to a term of imprisonment in current law in effect during the period described in subsection (a)(1)(B). This will assure that the length of a term of imprisonment, and the parole and good time statutes, will remain in effect as to any prisoner sentenced before the sentencing guidelines and the provisions of proposed 18 U.S.C. 3553 and 3624 go into effect pursuant to subsection (a)(1)(B). All other aspects of the sentencing provisions will go into effect on the effective date of the title as to any person sentenced after the effective date
 1984 U.S.Code Cong. & Admin.News at 3372.
 
 
 [6]
 18 U.S.C. Sec. 4206(c) provides in pertinent part:
 (c) The Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing: Provided, that the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.
 
 
 [7]
 With good time credits, D'Agostino could be released by May 10, 1991
 
 
 [8]
 D'Agostino's view of section 235(b)(3) also fails under the test articulated by the Supreme Court in Chevron v. U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Commission issued regulations interpreting section 235(b)(3) which state that the provision "does not apply to persons who will be on parole or mandatory release supervision at the expiration of the five-year period." 28 C.F.R. Sec. 2.64 (1987) [52 Fed.Reg. 5764, Feb. 26 1987]. The Commission derived its authority to promulgate interpretive regulations under 18 U.S.C. Secs. 4203(a)(1) and 4204(a)(6). See Sec. 235(b)(1)(A) Pub.L. 98-473, Title II, Secs. 218(a)(5), Oct. 12, 1984, 98 Stat. 2031. When the Commission departed from the guidelines to deny D'Agostino parole, it did so in light of this regulatory interpretation. When, as here, Congress has failed to address the precise question at issue directly, a reviewing court can invalidate an agency's construction of a statute only when it is arbitrary, capricious, or manifestly contrary to the statutory language or purpose. 5 U.S.C. Sec. 706; Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Given that the better reading of the statute permits departure from the guidelines, deference to the Commission's interpretation follows a fortiori. See Kele v. Carlson, 854 F.2d 338 (9th Cir.1988); Hackett v. United States Parole Commission, 851 F.2d 127 (6th Cir.1987); Lightsey v. Kastner, 846 F.2d 329 (5th Cir.1988)
 
 
 [9]
 The amendment to Sec. 235(b)(3) was the result of the adoption of Sec. 37 of S. 1236 which had originally been introduced with other bills that eventually became Pub.L. 98-473 but whose passage had been postponed. Noting that "section 235(b)(3) as enacted provides an unjustified windfall to some of the most dangerous prisoners" it was the Senate Committee's intent to give the Parole Commission back the ability to go beyond the guideline range where warranted. See 132 Cong.Rec. S7940 (April 17, 1986) (Statements of Senator Thurmond) (emphasis added)
 
 
 [10]
 Section 235(b)(3) of the Sentencing Reform Act as originally passed provided:
 The United States Parole Commission shall set a release date, for an individual who will be in its jurisdiction a day before the expiration of five years after the effective date of this Act, that is within the range that applies to the prisoner under the applicable parole guideline. A release set pursuant to this paragraph shall be set early enough to permit consideration of an appeal of the release date, in accordance with Parole Commission procedures, before the expiration of five years following the effective date of this Act. (emphasis added).
 On Dec. 7, 1987, Sec. 235(b)(3) was amended by the Sentencing Act of 1987, Pub.L. 100-182, 101 Stat. 1266 to read as follows:
 The United States Parole Commission shall set a release date, for an individual who will be in its jurisdiction the day before the expiration of five years after the effective date of this Act, pursuant to Section 4206 of Title 18 U.S.C. A release date set pursuant to this paragraph shall be set early enough to permit consideration of an appeal of the release date in accordance with Parole Commission procedures, before the expiration of five years following the effective of this Act. (emphasis added).
 
 
 [11]
 Although not a part of the record for purposes of appeal, D'Agostino notified us that the Appeals Board acted on the Notice of Action on January 20, 1989 and issued its Notice of Action on Appeal on April 19, 1989. The Board denied D'Agostino's request to reduce his offense severity rating. In addition, the Board affirmed its earlier decisions to set a release date outside the guideline range because D'Agostino played a leadership role in an unusually sophisticated and extensive public corruption scheme involving both a mayor and a school board president which resulted in damage to the public confidence in local government which the Commission felt could not be measured in dollars
 D'Agostino may, of course, appeal the April 19, 1989 decision rendered by the National Appeals Board of the Parole Commission which denied the reduction of his offense severity category.
 
 
 [12]
 Counsel for D'Agostino voiced concern that the Parole Commission could continue to grant rehearing sua sponte and deny a release date, thereby effectively cutting off habeas corpus review. We note that while a series of these actions--petition for habeas relief dismissed to allow the Commission to sua sponte grant rehearing--might possibly indicate bad faith, we cannot comment on what might happen in the future. We can only make a determination on the record before us which here does not raise a showing of bad faith on the part of the Parole Commission