Mr. Justice FIELD
delivered the opinion of the court.
This case comes before us on a writ of error to the Supreme Coui’t of Missouri, and involves a consideration of the test oath imposed by the constitution of that State. The plaintiff in error is a priest of the Roman Catholic Church, and was indicted and convicted in one of the circuit courts of the State of the crime of teaching and preaching as a priest and minister of that religious denomination without having first taken the oath, and was sentenced to pay a fine of five hundred dollars, and to he committed to jail until the same was paid. On appeal to the Supreme Court of the State, the judgment was affirmed.
The oath prescribed by the constitution, divided into its separable parts, embraces more than thirty distinct affirmations or tests. Some of the acts, against which it is directed, constitute offences of the highest grade, to which, upon conviction, heavy penalties are attached. Some of the acts have never been classed as offences in the laws of any State, and some of the acts, under many circumstances, would not even be blameworthy. It requires the affiant to deny not only that he has ever “been in armed hostility to the United States, or to the lawful authorities thereof,” but, among other things, that he has ever, “ by act or word,” manifested his adherence to the cause of the enemies of the United *317 States, foreign or domestic, or bis desire for their triumph over the arms of the United States, or his sympathy with those engaged in rebellion, or has ever harbored or aided any person engaged in guerrilla warfare against the loyal inhabitants of the United States, or has ever entered or left the State for the purpose of avoiding enrolment or draft in the military service of the United States; or, to escape the performance of duty in the militia of the United States, has ever indicated, in any terms, his, disaffection to the government of the United States in its contest with the Rebellion.
Every person who is unable to take this oath is declared incapable of holding, in the State, “ any office of honor, trust, or profit under its authority, or of being an officer, councilman, director, or trustee, or other manager of any corporation, public or private, now existing or hereafter established by its authority, or of acting as a professor or teacher in any educational’ institution, or in any common or other school, or of holding any real estate or other property in trust for the use of any church, religious society, or congregation.”
And every person holding, at the time the constitution takes effect, any of the offices, trusts, or positions mentioned, is required, within sixty days thereafter, to take the oath; and, if he fail to comply with this requirement, it is declared that his office, trust, or position shall ipso facto become vacant.
No person, after the expiration of the sixty days, is permitted, without taking the oath, “ to practice as an attorney or counsellor-at-law, nor after that period can any person be competent, as a bishop, priest, deacon, minister, elder, or other clergyman, of any religious persuasion, sect, or denomination, to teach, or preach, or solemnize marriages.”
Fine and imprisonment are prescribed as a punishment for holding or exercising any of “ the offices, positions, trusts, professions, or functions” specified, without having taken the oath; and false swearing or affirmation in taking it is declared to be perj ury, punishable by imprisonment in the penitentiary.
*318 The oath thus required is, for its severity, without any precedent that we can discover. In the first place, it is retrospective; it embraces all the past from this day; and, if taken years hence, it will also cover all the intervening period. In its retrospective feature we believe it is peculiar to this country. In England and France there have been test oaths, but they were always limited to an affirmation of present belief, or present disposition towards the government, and were never exacted with reference to particular instances of past misconduct. In the second place, the oath is directed not merely against overt and visible acts of hostility to the government, but is intended to reach words, desires, and sympathies, also. And, in the third place, it allows no distinction between acts springing from malignant enmity and acts which may have been prompted by charity, or affection, or relationship. If one has ever expressed sympathy with any who were drawn into the Rebellion, even if the recipients of that sympathy were connected by the closest ties of blood, he is as unable to subscribe to the oath as the most active and the most cruel of the rebels, and is equally debarred from the offices of honor or trust, and the positions and employments specified.
But, as it was observed by the learned counsel who appeared on behalf of the State of Missouri, this court cannot decide the case upon the justice or hardship of these provisions. Its duty is to determine whether they are in conflict with the Constitution of the United States. On behalf of Missouri, it is urged that they only prescribe a qualification for holding certain offices, and practising certain callings, and that it is therefore within the power of the State to adopt them. On the other hand, it is contended that they are in conflict with that clause of the Constitution which foi’bids any State to pass a bill of attainder or an ex post facto law.
'We admit the propositions of the counsel of Missouri, that the States which existed previous to the adoption of the Federal Constitution possessed originally all the attributes of sovereignty; that they still retain those attributes, *319 except as they have been surrendered by the formation o^ the Constitution, and the amendments thereto; that the new States, upon their admission into the Union, became invested with equal rights, and were thereafter subject only to similar restrictions, and that among the rights reserved to the States is the right of each State to determine the qualifications for office, and the conditions upon which its citizens may exercise their various callings and pursuits within its jurisdiction.
These are general propositions and involve principles of' the highest moment. But it by no means follows that, under the form of creating a qualification or attaching a condition, the States can in effect inflict a punishment for a past act which was not punishable at the time it was committed. The question is not as to the existence of the power of the State over matters of internal police, but whether that power has been made in the present case an instrument for the infliction of punishment against the inhibition of the Constitution.
Qualifications relate to the fitness or capacity of the party for a particular pursuit or profession. Webster defines the term to mean “ any natural endowment or any acquirement which fits a person for a place, office, or employment, or enables him to sustain any character, with success.” It is evident from the nature of the pursuits and professions of the parties, placed under disabilities by the constitution of Missouri, that many of the acts, from the taint of which they must purge themselves, have no possible relation to their fitness for those pursuits and professions. There can be no connection between the fact that Mr. Cummings entered or left the State of Missouri to avoid enrolment or draft in the military service of the United States and his fitness to teach the doctrines or administer the sacraments of his church; nor can a fact V'this kind or the expression of words of sympathy with sor Xthe persons drawn into the Rebellion constitute any eviu-». of .the unfitness of the attorney or counsellor to practice Ins profession, or of the professor to teach the ordinary branches of education, or of *320 fthe want of business knowledge or business capacity in the manager of a corporation, or in any director or trustee. It is manifest upon the simple statement of many of the acts and of the professions and pursuits, that there is no such relation between them as to render a denial of the commission of the acts at all appropriate as a condition of allowing the exercise of the professions and pursuits. The oath could not, therefore, have been required as a means of ascertaining whether parties were qualified or not for their respective callings or the trusts with which, they were charged. It was required in order to reach the person, not the calling. It was exacted, not from any notion that the several acts designated indicated unfitness for the callings, but because it was thought that the several acts deserved punishment, and that for many of them there was no way to inflict punishment except by depriving the parties, who had committed them, of some of the rights and privileges of the citizen.
The disabilities created by the constitution of Missouri must be regarded as penalties — they constitute punishment. We do not agree with the counsel of Mis*1 uri that “ to punish one is to deprive him of life, libe- or property, and that to take from him anything less than ¡ ese is no punishment at all.” The learned counsel does m t use these terms —life, liberty, and property — as comprehending every right known to the law. ITe does not include under liberty freedom from outrage on the feelings as well as restraints on the person. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment. By statute 9 and 10 *321 William III, chap. 82, if any person educated in or having made a profession of the Christian religion, did, “ by writing, printing, teaching, or advised speaking,” deny the truth of the religion, or the divine authority of the Scriptures, he was for the first offence rendered incapable to hold any office or place of trust; and for the second he was rendered incapable of bringing any action, being guardian, executor, legatee, or purchaser of lands, besides being subjected to three years’ imprisonment without bail.*
By statute 1 George I, chap. 13, contempts against the king’s title, arising from refusing or neglecting to take certain prescribed oaths, and yet anting in an office or place of trust for which they were required, were punished by incapacity to hold any public office; to prosecute any suit; to be guardian or executor; to take any legacy or deed of gift; and to vote at any election for members of Parliament; and the offender was also subject to a forfeiture of five hundred pounds to any one who would sue for the same.†
“ Some punishments,” says .Blackstone, “ consist in exile or banishment, by abjuration of the realm or transportation; others in loss of liberty by perpetual or temporary imprisonment. Some extend to confiscation by forfeiture of lands or movables, or both, or of the profits of lands for life; others induce a disability of holding offices or employments, being heirs, executors, and the. like.”‡
In Prance, deprivation or suspension of civil rights, or of some of them, and among these of the right of voting, of eligibility to office, of taking part in family councils, of being guardian or trustee, of bearing arms, and of teaching or being employed in a school or seminary of learning, are punishments prescribed by her code.
The theory upon which our political institutions rest is, that all men have certain inalienable rights — that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection *322 -of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined.
Punishment not being, therefore, restricted, as contended by counsel, to the deprivation of life, liberty, or property, but also embracing deprivation or suspension of political or civil rights, and the disabilities prescribed by the provisions of the Missouri constitution being in efie^ punishment, we proceed to consider whether there is am inhibition in the Constitution of the United States against their enforcement.
The counsel for Missouri closed his argument in this case by presenting a striking picture of the struggle for ascendency in that State during the recent Rebellion between the friends and the enemies of the Union, and of the fierce passions which that struggle aroused. It was in the midst of the struggle that the present constitution was framed, although it was not adopted by the people until the war had closed. It would have been strange, therefore, had it not exhibited in its provisions some traces of the excitement amidst which the convention held its deliberations.
It was against the excited action of the States, under such influences as these, that the framers of the Federal Constitution intended to guard. In Fletcher v. Peck,* Mr. Chief Justice Marshall, speaking of such action, uses this language : “ Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the Constitution viewed with some apprehension the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and 'strong passions to which men are exposed. The restrictions on the legislative power of the States are obviously founded in this sentiment; and the Constitution of the United States contaius what may be deemed a bill of rights for the people of each State.”
*323 “ ‘No State shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts.’ ”
A bill of attainder is a legislative act which inflicts punishment without a judicial trial.
If the punishment be less than death, the act is termed a bill of pains and penalties. "Within the meaning of the Constitution, bills of attainder include bills of pains and penalties. In these cases the legislative body, in addition to its legitimate functions, exercises the powers and office of judge; it assumes, in the language of the text-books, judicial magistracy ; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial; it determines the sufficiency of the proofs produced, whether conformable to .the rules of evidence or otherwise; and it fixes the degree of punishment in accordance with its own notions of the enormity of the offence.
“ Bills of this sort,” says Mr. Justice Story, “ have been most usually passed in England in times of rebellion, or gross subserviency to the crown, or of violent political excitements ; periods, in which all nations are most liable (as well the free as the enslaved) to forget their duties, and to trample upon the rights and liberties of others.”*
These bills are generally directed against individuals by name; but they may be directed against a whole class. The bill against the Earl of Kildare and others, passed in the reign of Henry VIII,† enacted that “ all such persons which be or heretofore have been comforters, abettors, partakers, confederates, or adherents unto the said’’ late earl, and certain other parties, who were named, “ in his or their false and traitorous acts and purposes, shall in likewise stand, and be attainted, adjudged, and convicted of high treason;” and that “ the same attainder, judgment, and conviction against the said comforters, abettors, partakers, confederates, and adherents, shall be as strong and effectual in the law against them, and every of them, as though they and every of them *324 bad been specially, singularly, and particularly named by tbeir proper names and surnames in the said act.”
These bills may inflict punishment absolutely, or may inflict it conditionally.
The bill against the Earl of Clarendon, jaassed in the reign of Charles the Second, enacted that the earl should suffer perpetual exile, and be forever'banished from the realm; and that if he returned, or was found in England, or in any other of the king’s dominions, after the first of February, 1667, he should suffer the pains and penalties of treason; with the proviso, however, that if be surrendered himself before the said first day of February for trial, the penalties and disabilities declared should be void and of no effect.*
“A British act of Parliament,” to cite the language of the Supreme Court of Kentucky, “might declare, that if certain individuals, or a class of individuals, failed to do a given act by a named day, they should be deemed to be, and treated as convicted felons or traitors. Such an act comes precisely within the definition of a bill of attainder, and the English courts would enforce it without indictment or trial by jury.”†
If the clauses of the second article of the constitution of Missouri, to which we have referred, had in terms declared that Mr. Cummings was guilty, or should be held guilty, of having been in armed hostility to the United States, or of having entered that State to avoid being enrolled or drafted into the military service of the United States, and, therefore, should be deprived of the right to preach as a priest of the Catholic Church, or to teach in any institution of learning, there could be no question that the clauses would constitute a bill of attainder within the meaning of the Federal Constitution. If these clauses, instead of mentioning'his name, had declared that all priests and clergymen within the State of Missouri were guilty of these acts, or should be held guilty of them, and hence be subjected to the like deprivation, the clauses would be equally open to objection. And, *325 further, if these clauses bad declared that all sucb priests and clergymen should be so-held guilty, and be thus deprived, provided they did not, by a day designated, do certain specified acts, they would be no less within the inhibition of the Federal Constitution.
In all these cases there would be the legislative enactment creating the deprivation without any of the ordinary forms and guards provided for the security of the citizen in the administration of justice by the established tribunals.
The results which would follow from clauses of the character mentioned do follow from the clauses actually adopted. The difference between the last case supposed and the case actually presented is one of form only, and not of substance. The existing clauses presume the guilt of the priests and clergymen, and adjudge the deprivation of their right to preach or teach unless the presumption be first removed by their expurgatory oath — in other words, they assume the guilt and adjudge the punishment conditionally. The clauses supposed differ only in that they declare the guilt instead of assuming it. The deprivation is effected with equal certainty in the one case as it would be in the other, but not with equal directness. The purpose of the lawmaker in the case supposed would be openly avowed; in the case existing it is only disguised. The legal result must be the same, for what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding.
"We proceed to consider the second clause of what Mr. Chief Justice Marshall terms a bill of rights for the people of each State — the clause which inhibits the passage of an ex post facto law.
By an ex post facto law is meant one which imposes a pun- *326 isliment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required.
In Fletcher v. Peck, Mr. Chief Justice Marshall defined an ex post facto law to be one “ which renders an act punishable in a manner in which it was not punishable when it was committed.” “ Such a law,” said that eminent judge, “ may inflict penalties on the person, or may inflict pecuniary penalties which swell the public treasury. The legislature is then prohibited from passing a law by which a man’s estate, or any part of it, shall be seized for a crime, which was not declared by some previous law to render him liable to that punishment. Why, then, should violence be done to the natural meaning of words for the purpose of leaving to the legislature the power of seizing for public use the estate of an individual, in the form of a law annulling the title by which he holds the estate? The court can perceive no sufficient grounds for making this distinction. This rescinding act would have the effect of an ex post facto law. It forfeits the estate of Fletcher for a crime not committed by himself, but by those from whom he purchased. This cannot be effected in the form of an ex post facto law, or bill of attainder; why, then, is it allowable in the form of a law annulling the original grant ?”
The act to which reference is here made was one passed by the State of Georgia, rescinding a previous act, under which lands had been granted. The rescinding act, annulling the title of the grantees, did not, in terms, define any crimes, or inflict any punishment, or direct any judicial proceedings; yet, inasmuch as the legislature was forbidden from passing any law by which a man’s estate could be seized for a crime, which was not declared such by some previous law rendering him liable to that punishment, the chief justice was of opinion that the rescinding act had the effect of án ex post facto law, and was within the constitutional prohibition.
*327 The clauses in the Missouri constitution, which are the subject of consideration, do not, in terms, define any crimes, or declare that any punishment shall be inflicted, but they produce the same result upon the parties, against whom they are directed, as though the crimes were defined and the punishment was declared. They assume that there are persons in Missouri who are guilty of some of the acts designated. They would have no meaning in the constitution were not such the fact. They are aimed at past acts, and not future acts. They wore intended especially to operate upon parties who, in some form or manner, by action or words, directly or indirectly, had aided or countenanced the Rebellion, or sympathized with parties engaged in the Rebellion, or had endeavored to escape the proper responsibilities and duties of a citizen in time of war; and they were intended to operate by depriving such persons of the right to hold certain offices and trusts, and to pursue their ordinary and regular avocations. This deprivation is' punishment; nor is it any less so because a way is opened for escape from it by the expurgatory oath. The framers of the constitution of Missouri knew at the time that whole classes of individuals would be unable to take the oath prescribed. To them there is no escape provided; to them the deprivation was intended to be, and is, absolute and perpetual. To make the enjoyment of a right dependent upon an impossible condition is equivalent to an absolute denial of the right under any condition, and such denial, enforced for a past act, is nothing less than punishment imposed for that act. It is a misapplication of terms to call it anything else.
Now, some of the acts to which the expurgatory oath is directed were not offences at the time they were committed. It was no offence against any law to enter or leave the State of Missouri for the purpose of avoiding enrolment or draft in the military service of the United States, however much the evasion of such service might be the subject of moral censure. Clauses which prescribe a penalty for an act of this nature are within the terms of the definition of an ex *328 post facto law — “ they impose a punishment for an act not punishable at the time it was committed..”
Some of the acts at which the oath is directed constituted high offences at the time they were committed, to which, upon conviction, fine and imprisonment, or other heavy penalties, were attached. The clauses which provide a further penalty for these acts are also within .the definition of an ex post facto law — “ they impose additional punishment to that prescribed when the act was committed.”
And this is not all. The clauses in question subvert the presumptions of innocence, and alter the rules of evidence, which heretofore, under the univérsally recognized principles of the common law, have been supposed to be fundamental and unchangeable. They assume that the parties are guilty; they call upon the parties to establish their innocence ; and they declare that such innocence can be shown only in oue way — by an inquisition, in the form of an ex-purgatory oath, into the consciences of the parties.
The objectionable character of these clauses will be more apparent if we put them into the ordinary form of a legislative act. Thus, if instead of the general provisions in the constitution the convention had provided as follows: Be it enacted, that all persons who have been in armed hostility to the United States shall, upon conviction thereof, not only be punished as the laws provided at the time the offences charged were committed, but shall also be thereafter rendered incapable of holding any of the offices, trusts, and positions, and of exercising any of the pursuits mentioned in the second article of the constitution of Missouri; — no one would have any doubt of the nature of the enactment. It would be an ex post facto law, and void; for it would add a new punishment for an old offence. So, too, if the convention had passed an enactment of a similar kind with reference to those acts which do not constitute offences. Thus, had it provided as follows: Be it enacted, that all persons who have heretofore, at any time, entered or left the State of Missouri, with intent to avoid enrolment or draft in the military service of the United States, shall, upon conviction *329 thereof, be forever rendered incapable of holding any office of honor, trust, or profit in the State, or of teaching in any seminary of learning, or of preaching as a minister of the gospel of any denomination, or of exercising any of the professions or pursuits mentioned in the second article of the constitution; — there would be no question of the character of the enactment. It would be an ex post facto law, because it would impose a punishment for an act not punishable at the time it was committed.
The provisions of the constitution of Missouri accomplish precisely what enactments like those supposed would have accomplished. They impose the same penalty, without the formality of a judicial trial and.conviction; for the parties embraced by the supposed enactments would be incapable of taking the oath prescribed; to them its requirement would be an impossible condition. Now, as the State, had she attempted the course supposed, would have failed, it must follow that any other mode producing the same result must equally fail. The provision of the Federal Constitution, intended to secure the liberty of the citizen, cannot be evaded by the form in which the power of the State is exerted. If this were not so, if that which cannot be accomplished by means looking directly to the end, can be accomplished by indirect means, the inhibition may be evaded at pleasure. No kill'd of oppression can be named, against which the framers of the Constitution intended to guard, which may not be effected. Take the case supposed by counsel — that of a man tried for treason and acquitted, or, if convicted, pardoned — the legislature may nevertheless enact that, if the person thus acquitted or pardoned does not take an oath that he never has committed the acts charged against him, he shall not be permitted to hold any office of honor or trust or profit, or pursue any avocation in the State. Take the case before us; — the constitution of Missouri, as we have seen, excludes, on failure to take the oath prescribed by it, a large class of persons within her borders from numerous positions and pursuits; it would have been equally within the power of the State to have extended the *330 exclusion so as to deprive tbe parties, wlio are unable to take tbe oath, from any avocation whatever in the State. Take still another case: — suppose that, in the progress of events, persons now in the minority in the State should obtain the ascendency, and secure the control of the government;' nothing could prevent, if the constitutional prohibition can be evaded, the enactment of a provision requiring every person, as a condition of holding any position of honor or trust, or of pursuing any avocation in the State, to take an oath that he had never advocated or advised or supported the imposition of the present expuxgatory oath. Under this form of legislation the most flagrant invasion of private rights, in periods of excitement, maybe enacted, and individuals, and even whole classes, may be deprived of political and civil rights.
A question arose in New York, soon after the treaty of peace of 1783, upon a statute of that State, which involved a discussion of the nature and character of these expurgatory oaths, when used as a means of inflicting punishment for past conduct. The subject was regarded as so important, and the requirement of the oath such a violation of the fundamental principles of civil liberty, and the rights of the citizen, that it engaged the attention of eminent lawyers and distinguished statesmen of the time, and among others of Alexander Hamilton. "We will cite some passages of a paper left by him on the subject, in which, with his characteristic fulness and ability, he examines the oath, and demonstrates that it is not only a mode of inflicting punishment, but a mode in violation of all the constitutional guarantees, secured by the Revolution, of the rights and. liberties of the people.
“If we examine it” (the measure requiring the oath), said this great lawyer, “with an unprejudiced eye, we must acknowledge, not only that it was an evasion of the treaty, but a subversion of one great principle of social security, to wit: that every man shall be presumed innocent until he is proved guilty. This was to invert the order of things; and, instead of obliging the State to prove the guilt, in order *331 to inflict the penalty, it was to oblige the citizen to establish his own innocence to avoid the penalty. It ivas to excite scruples in the honest and conscientious, and to hold out a bribe to perjury. ... It was a mode of inquiry who had committed any of those crimes to which the penalty of disqualification was annexed, with this aggravation, that it deprived the citizen of the benefit of that advantage, which he would have enjoyed by leaving, as in all other cases, the burden of the proof upon the prosecutor.
“ To place this matter in a still clearer light, let it be supposed that, instead of the mode of indictment and tidal by jury, the legislature was to declare that every citizen who did not swear he had never adhered to the King of Great Britain should incur all the penalties which our treason laws prescribe. Would this not be a palpable evasion of the treaty, and a direct infringement of the Constitution? The principle is the same in^both cases, with only this difference in the consequences — that in the instance already acted upon the citizen forfeits a part of his rights; in the one supposed he would forfeit the whole. The degree of punishment is all that distinguishes the cases. In either, justly considered, it is substituting a new and arbitrary mode of prosecution to that ancient and highly esteemed one recognized by the laws and constitution of the State. I mean the trial by wry-
“ Let us not forget that the Constitution declares that trial by jury, in all eases in which it has been formerly used, should remain inviolate forever, and that the legislature should at no time erect any new jurisdiction which should not proceed .according to the course of the common law. Nothing can be more repugnant to the true genius of the common law than such an inquisition as lias been mentioned into the consciences of men. ... If any oath with retrospect to past conduct were to be made the condition on which individuals, who have resided within the British lines, should hold their estates, we should immediately see that this proceeding would be tyrannical, and a violation of the treaty; and yet, when the same mode is employed to divest *332 that right, which ought to be deemed still more sacred, many of us are so infatuated as to overlook the mischief.
“ To say that the persons who will be affected by it have previously forfeited that right, and that, therefore, nothing is taken away from them, is a begging of the question. How do we know who are the persons in this situation? If it be answered, this is the mode taken to ascertain it — the objection returns — ’tis an improper mode; because it puts the most essential interests of the citizen upon a worse footing than we should be willing to tolerate where inferior interests were concerned; and because, to elude the treaty, it substitutes for the established and legal mode of investigating crimes and inflicting forfeitures, one that is unknown to the Constitution, and repugnant to the genius of our law.”
Similar views have frequently been expressed by the judiciary in cases involving analogous questions. They are presented with great force in The matter of Dorsey ;* but we do not deem it necessary to pursue the subject further.
The judgmeut of the Supreme Court of Missouri must be reversed, and the cause remanded, with directions to enter a judgment reversing the judgment of the Circuit Court, and directing that court to discharge the defendant from imprisonment, and suiter him to depart without day.
AND IT IS SO ORDERED.

 4 Black. 44.

 Id. 124.

 Id. 377.

 6 Cranch, 137.

 Commentaries, § 1344.

 28 Henry VIII, chap. 18; 3 Stats, of the Realm, 694.

 Printed in 6 Howell’s State Trials, p. 391.

 Gaines v. Buford, 1 Dana, 510.

 7 Porter, 294.