Michael B. ELGIN, Aaron Lawson, Henry Tucker and Christon Colby on behalf of themselves and similarly situated men throughout the United States, Plaintiffs,

v.

UNITED STATES of America, United States Department of the Treasury, and United States Department of the Interior, Defendants.

Civil Action No. 07–12391–DPW.

United States District Court,
D. Massachusetts.

Jan. 26, 2009.

Lori A. Jodoin, Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Boston, MA, for Plaintiffs.

Jennifer A. Serafyn, United States Attorney's Office, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

The Military Selective Service Act (the "MSSA"), 50 App. U.S.C. §§ 451–473, requires that men register with the Selective Service System between the ages of eighteen and twenty-six. 50 App. U.S.C. § 453(a). A separate federal statute, 5 U.S.C. § 3328(a)(2), provides that men who knowingly and willfully fail to register under the MSSA are ineligible for employment by a federal executive agency. The four Plaintiffs in this suit seek to maintain employment with the federal government. They were barred from doing so because they failed to register for the military draft with the Selective Service System.

When that employment bar was imposed upon them, it was no longer possible for any of them to register.

In Count One of their Amended Complaint, the Plaintiffs allege that the employment bar imposed by § 3328 is an unconstitutional bill of attainder. Plaintiffs allege in Count Two that the MSSA, which requires men—but not women—to register with the Selective Service System, violates the equal protection obligation of the Constitution. The Defendants have moved to dismiss both Counts pursuant to Fed.R.Civ.P. 12(b)(6), and the Plaintiffs have moved for partial summary judgment as to Count One.

The registration provisions of the MSSA have already occasioned unsuccessful challenges in the Supreme Court based upon the Constitution's prohibition of bills of attainder, *Selective Service System v. Minnesota Public Interest Research Group ("MPIRG")*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), and the Constitution's equal protection guarantee, *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). But the statutory employment bar at issue before me is materially different from the loan disqualification challenged in *MPIRG* and I find that the Court's *MPIRG* analysis actually supports the bill of attainder claim here. By contrast, there has not been a sufficient change in the material circumstances underpinning the Court's equal protection analysis in *Rostker* to justify relitigation of the issue at this time in this case. Accordingly, while I will grant partial summary judgment to the Plaintiffs on the bill of attainder claim of Count One, I will also grant the Defendants' motion to dismiss as to the equal protection challenge.

## I. BACKGROUND

The Military Selective Service Act authorizes the President to require male citizens and residents of the United States to register for the draft. The MSSA states that "it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who ... is between the ages of eighteen and twenty-six, to present himself for and submit to registration...." 50 App. U.S.C. § 453(a). The Selective Service System, the institution responsible for the registration process, became inactive in 1975 when President Ford discontinued draft registration. In 1980, Congress, at the request of President Carter, reactivated the registration process for male citizens and residents. *Rostker*, 453 U.S. at 60–61, 101 S.Ct. 2646 (citing Pub. L. 96–282, 94 Stat. 552 (1980)). President Carter then issued a Proclamation requiring registration for male citizens and residents born on or after February 1, 1960 who attained their eighteenth birthday. Proclamation No. 4771, 45 Fed.Reg. 45,247 (July 2, 1980).

In 1985, Congress created negative employment consequences through § 3328 for failing to register with the Selective Service System. The statute provided that an individual who is required to register under the MSSA, and who "knowingly and willfully" does not do so, "shall be ineligible for appointment to a position in an Executive agency." 5 U.S.C. § 3328(a).

The Plaintiffs in this case each sought to maintain employment with an executive agency of the federal government; it is undisputed [1] that each was denied a feder-

---

1. Because I will act upon Plaintiffs' motion for summary judgment, I draw the factual discussion in this Memorandum regarding the

Plaintiffs' employment histories from the affidavits submitted by the Plaintiffs with their Local Rule 56.1 statement of material facts in

al executive position when the relevant agency employer discovered that the Plaintiff at issue had not registered with the Selective Service System.

Michael Elgin was hired by the Internal Revenue Service ("IRS") in 1991, when he was around twenty-five. On February 22, 2007, the Office of Personnel Management ("OPM") found that Elgin was ineligible for IRS employment because he failed to register with the Selective Service System. He was around forty-one at the time he lost his job.[2]

Aaron Lawson, thirty-two, began working at the Bureau of Land Management in 2003 when he was around twenty-six. He has been notified that his employment will be terminated as a result of his failure to register with the Selective Service System.[3]

Henry Tucker worked for the Federal Deposit Insurance Corporation ("FDIC") for seventeen years. An offer to work at the National Institutes of Health ("NIH"), extended in 2007, was withdrawn when the NIH learned that Tucker had never registered with the Selective Service System.[4]

Christon Colby was employed by the IRS for more than five years. In 2006, when Colby was around thirty years old, the OPM determined he had knowingly and willfully failed to register for the draft,

and was not eligible for federal agency employment.

## II. STANDARD OF REVIEW

On a motion to dismiss, I "accept[ ] the complaint's well-pleaded facts as true and indulg[e] all reasonable inferences in the plaintiff's favor." *Cook v. Gates,* 528 F.3d 42, 48 (1st Cir.2008). A complaint, to survive a motion to dismiss, "must allege 'a plausible entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007)).

 I review a motion for summary judgment viewing the facts and making reasonable inferences in the light most favorable to the nonmoving party. *Cordi–Allen v. Conlon,* 494 F.3d 245, 250 (1st Cir.2007). The movants must show that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Their motion for partial summary judgment based on a facial challenge confronts an additional hurdle. A facial challenge, "the most difficult challenge to mount successfully," requires the movant to show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

---

support of their motion for partial summary judgment. The Defendants have moved to strike the statement and affidavits essentially on grounds they adduce facts not within the knowledge of Plaintiffs. I will deny that motion because, as material to my disposition of the Plaintiffs' partial summary judgment motion, I find the Plaintiffs have adduced competent evidence which could be contested by the Defendants, if they choose to do so, without the need for discovery.

2. Because the Plaintiffs have not provided their dates of birth, I must estimate their ages at the time they lost their government posi-

tions, based on their ages at the time the affidavits in support of their motion for summary judgment were executed. Elgin's affidavit hinders this task because Elgin did not date the document when he executed it.

3. A date of termination has not been provided.

4. The affidavit does not provide Tucker's age or date of birth. The affidavit also does not state whether or not Tucker is still employed by the FDIC.

## III. ANALYSIS

### A. Bill of Attainder

■ The Plaintiffs allege that 5 U.S.C. § 3328 is an unconstitutional bill of attainder that legislatively punishes men age twenty-six and older who failed to register for the Selective Service System. The Plaintiffs present this claim as a facial challenge to the statute.

■ Article I of the U.S. Constitution states: "No bill of attainder or ex post facto law shall be passed." U.S. Const., Art. I, § 9, cl. 3. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

■ The Constitution's prohibition of bills of attainder was motivated by rejection of practices of the English Parliament, which periodically punished specifically designated persons or groups without trial. *United States v. Brown*, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (summarizing the basic history of bills of attainder). Although bills of attainder have traditionally identified persons by name for punishment, they may also include designations of groups of persons according to past conduct. *MPIRG*, 468 U.S. at 847, 104 S.Ct. 3348. The Bill of Attainder Clause not only protects individuals from legislative punishment, but also serves an important function in preserving the separation of powers. The Clause acts as "a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *Brown*, 381 U.S. at 442, 85 S.Ct. 1707.

The Supreme Court has identified three requirements for a statute to qualify as an unconstitutional bill of attainder: specification of the affected persons; punishment; and lack of a meaningful judicial role. *MPIRG*, 468 U.S. at 847, 104 S.Ct. 3348.

### 1. Specification

■ The specification requirement is satisfied when the statute either identifies individuals by name or as ascertainable members of a group based on past conduct. *MPIRG*, 468 U.S. at 847, 104 S.Ct. 3348. A statute targeting groups based on past conduct can be a bill of attainder when the conduct "serves as 'a point of reference for the ascertainment of particular persons ineluctably designated by the legislature' for punishment." *Id.* (quoting *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)).

Courts have identified several "guideposts" to help determine whether the specification requirement has been met. *See SeaRiver Maritime Fin. Holdings v. Mineta*, 309 F.3d 662, 669 (9th Cir.2002). One guidepost is whether the statute targets individuals or a class based on past conduct which operates as a designation of particular persons. *MPIRG*, 468 U.S. at 847, 104 S.Ct. 3348; *SeaRiver Maritime*, 309 F.3d at 670. It is uncontested that the individuals affected by § 3328 are determined by their past acts (or more accurately, by their past failures to act).

Another guidepost is whether the past conduct consists of "irreversible acts." *MPIRG*, 468 U.S. at 848, 104 S.Ct. 3348; *SeaRiver Maritime*, 309 F.3d at 671. Plaintiffs are part of a group targeted by § 3328 whose conduct is irreversible because men who reach the age of twenty-six are no longer able to register with the Selective Service System. Michael Elgin, Aaron Lawson, Henry Tucker and Christon Colby were all twenty-six or older when their employing agencies, or prospective employing agencies, learned of

their nonregistered status, and therefore they had no opportunity to correct their status.

Whether the group is "easily ascertainable" is yet another way to judge the specification requirement. *Brown,* 381 U.S. at 448–49, 85 S.Ct. 1707; *SeaRiver Maritime,* 309 F.3d at 669. The phrase "easily ascertainable" was introduced by the Court in *United States v. Lovett,* 328 U.S. 303, 315, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). In *Cummings v. Missouri,* 71 U.S. 277, 4 Wall. 277, 18 L.Ed. 356 (1866), the Court had stated that bills of attainder, though "generally directed against individuals by name," may also "be directed against a whole class." *Id.* at 323. In *Lovett,* the Court held that unconstitutional bills of attainder apply "either to named individuals or to easily ascertainable members of a group." *Lovett,* 328 U.S. at 315, 66 S.Ct. 1073. Although bill of attainder jurisprudence has not yet provided great detail as to what makes a class "easily ascertainable," the question is plainly a matter of degree that the record permits me to address in this case.

The Plaintiffs allege that § 3328 satisfies the ascertainability requirement because the statute applies to the "easily identifiable group of men born after December 31, 1959 who did not register with the Selective Service System." An online database allegedly allows for easy identification of the individuals who fall into that group. The Government responds that due to the procedures for denying an individual federal employment under § 3328, the affected group is not as "easily" identifiable as the Plaintiffs allege. The statutory language purports to impose the bar not simply upon those men who did not register, but rather, upon those who "knowingly and willfully" did not register. 5 U.S.C. § 3328(a)(2).

Under the MSSA, a person cannot be denied a right under federal law for failing to register if "the person shows by a preponderance of the evidence that the failure . . . was not a knowing and willful failure to register." 50 App. U.S.C. § 462(g)(2). The procedure for determining whether an individual is eligible for federal agency employment is outlined in federal regulations, 5 C.F.R. § 300.705 (1999). If the individual is under age twenty-six, the agency will advise him to register promptly and then to show the agency proof of his registration. If the individual is age twenty-six or older, then the employing agency provides written notice to the individual that he is ineligible for federal agency employment. 5 C.F.R. § 300.705(d)(1). If the individual submits a written application to the OPM for a decision on whether his failure to register was knowing and willful, the OPM will provide one. *Id.* Unless the OPM finds that the individual's failure to register "was neither knowing nor willful," the individual is not eligible for federal employment. 5 C.F.R. § 300.705(e). Under the statute, 50 App. U.S.C. § 462(g)(2), and the implementing federal regulations, 5 C.F.R. § 300.706(a), the burden of proof is on the applicant. As a matter of statute, this burden is not easily rebuttable because "(e)very person shall be deemed to have notice of the requirements [*inter alia* of resignation] upon publication by the President of a proclamation or other public notice fixing a time for any registration . . ." 50 App. U.S.C. § 465(a). By issuing Presidential Proclamation No. 4771, 45 Fed.Reg. 45,247 (July 2, 1980), President Carter provided the requisite notice. As will appear below, this "deeming" presumption of knowledge is apparently treated as effectively irrebuttable by the OPM.

The elaborate procedures established for determining knowledge or willfulness under § 3328 give the appearance of not immediately ascertaining the members of

the burdened group. In theory, an additional factual determination beyond mere lack of registration must be made. But the overall statutory structure as administered by the OPM in response to congressional direction serves to identify quite readily the individuals specified for punishment. Although the "knowingly and willfully" requirement of § 3328 seemingly makes the targeted class somewhat more difficult to ascertain, it does not remove the targeted class from the scope of the bill of attainder prohibition. Determining ease of ascertainment is, in any event, a matter of judgment. And given the OPM's treatment of the "knowingly and willingly" element as essentially an irrebuttable presumption, *see* Section III.A.3 *infra*, nonregistration appears to be enough to establish this trait. Of course, the ease of ascertainment is not a necessary criterion, but rather "a guidepost[ ] to aid in determining whether legislation singles out a person or class." *SeaRiver Maritime*, 309 F.3d at 669. The other guideposts—targeting past conduct and the irreversibility of that conduct, *id.* at 669–70—are plainly met by § 3328's statutory categorization of affected individuals. Moreover, I find the class of persons burdened by the statute can be ascertained with relative ease. Consequently, I find the specification requirement for a bill of attainder is met by § 3328.

### 2. Punishment

■ Deciding whether a statute imposes punishment entails three inquiries: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *MPIRG*, 468 U.S. at 852, 104 S.Ct. 3348

(quoting *Nixon*, 433 U.S. at 473, 475–76, 478, 97 S.Ct. 2777). To constitute a bill of attainder, a statute need not evidence all three of these factors. *SeaRiver Maritime*, 309 F.3d at 673; *see also Nixon*, 433 U.S. at 475, 97 S.Ct. 2777 (finding that "new burdens and deprivations"—those not within the historical meaning of punishment—also "might be legislatively fashioned that are inconsistent with the bill of attainder guarantee"). Nevertheless, here, I find that all three factors are embodied in § 3328.

### a. Historical meaning of punishment

The Supreme Court has consistently held that exclusion from a type of employment falls within the category of legislative punishment. *See, e.g.*, *MPIRG*, 468 U.S. at 852, 104 S.Ct. 3348 (noting that legislative punishment "has expanded to include legislative bars to participation by individuals or groups in specific employments or professions"); *Cummings*, 71 U.S. at 321–22 ("[A]ll men have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and ... in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one...."); *Ex parte Garland*, 71 U.S. 333, 377, 4 Wall. 333, 18 L.Ed. 366 (1866) ("And exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct.").

■ The Court has recognized that exclusion from employment by the federal government in particular is punitive. "[P]ermanent proscription from any opportunity to serve the Government is a punishment, and of a most severe type." *United States v. Lovett*, 328 U.S. 303, 316, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). In *Lovett* the Court found that Congress had

invoked this type of punishment only for "odious and dangerous crimes." *Id.* I therefore conclude that the lifetime prohibition of nonregistered males from federal agency employment after the age of twenty-five falls within the historical meaning of legislative punishment.

### b. Nonpunitive legislative purpose

The second inquiry, whether the statute reasonably can be said to further a nonpunitive legislative purpose, must also be answered adversely to the Defendants. The plain purposes behind § 3328 are to impose retribution on those individuals who failed to register and to deter individuals between eighteen and twenty-six from failing to do so. Although other purposes may also bring statutory consequences within the definition of punishment, both retribution and deterrence are at the core of what it is to be punitive. *Cf. Brown*, 381 U.S. at 458, 85 S.Ct. 1707 ("It would be archaic to limit the definition of 'punishment' to 'retribution.' Punishment serves several purposes; retributive, rehabilitative, deterrent and preventive.").[5]

To insure that characterization of purpose is not mere labeling, a useful evaluative approach to this inquiry is to ask "whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession." *Dehainaut v. Pena*, 32 F.3d 1066, 1071–72 (7th Cir.1994) (quoting *DeVeau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960)). In *Dehainaut*, the Seventh Circuit rejected the plaintiffs' bill of attainder characterization because the court found "an adequate nexus between the restriction imposed and the legitimate government purpose." 32 F.3d at 1072.

The Defendants here have not established a nexus between a lifetime prohibition from federal agency employment and male nonregistration with the Selective Service System. There is no apparent link, other than a purpose to punish, between job qualifications for agency positions throughout the federal government and failure to register by age twenty-six. These circumstances are unlike those in *Dehainaut*, where a presidential directive permanently excluded aviation strike participants from employment with the Federal Aviation Administration ("FAA"). *Id.* at 1069. The strike participants could still apply for jobs elsewhere in the federal government; they were prohibited only from holding jobs at the FAA or related agencies. *Id.* Based on the scope of the prohibition, the Seventh Circuit concluded that the purpose of the restriction was not to punish, but rather to guarantee that individuals with a past demonstrated tendency to interfere with "the safety and efficiency of the FAA's operations" through work stoppage, *id.* at 1072, would not be placed again in that particular work environment, mingling with other workers who had not engaged in such action.

The Seventh Circuit's treatment of aviation strike participants may usefully be contrasted with the approach of *Cummings* and *Garland*, cases involving Civil War-era laws that conditioned employment on individuals taking an oath that they had never supported the Confederacy. *Cummings*, 71 U.S. at 317; *Ex parte Garland*, 71 U.S. at 375–76. Because individuals who had prior associations with the Confederacy were unable to give this oath without perjuring themselves, the laws effectively punished individuals for supporting the Confederacy. *See Cummings*, 71

---

**5.** Retribution and general deterrence are the first two general factors to be considered in federal criminal sentencing when evaluating "the need for [a criminal] sentence." 18 U.S.C. § 3553(a)(2)(A) (retribution) & (B) (general deterrence).

U.S. at 325; *Garland,* 71 U.S. at 377. Unlike *Dehainaut,* however, those laws had no relationship to the qualifications for the vocations in question—respectively priest and lawyer. According to the Court, "[t]he oath could not . . . have been required as a means of ascertaining whether parties were qualified or not for their respective callings or the trusts with which they were charged." *Cummings,* 71 U.S. at 319. Instead, the oath was used "in order to reach the person, not the calling." *Id.*

The Court in *MPIRG* also considered the relationship between the regulation in question and the purpose it was allegedly serving. The Court there addressed the constitutionality of Section 12(f) of the MSSA, 50 App. U.S.C. § 462(f), which denies certain federal financial aid to males who failed to register under the MSSA. The Court upheld the law because it found that the purpose of Section 12(f) was to encourage registration among those who could still do so, rather than to inflict forbidden punishment. *MPIRG,* 468 U.S. at 849–50, 855–56, 104 S.Ct. 3348.

The statute in *MPIRG* is distinguishable from § 3328 in several ways. First, "the group of young men who must register for the draft overlaps in large part with the group of students who are eligible for Title IV student's aid." *Id.* at 854, 104 S.Ct. 3348. No such overlap exists between males age twenty-six and older who have failed to register and males in the same age group employed by federal agencies.

Second, Section 12(f) was designed to regulate "*all* nonregistrants, rather than to single out intentional nonregistrants for

punishment." *Id.* at 855, 104 S.Ct. 3348 (emphasis in original). By contrast, § 3328 targets knowing and willful nonregistrants. The statute's textual emphasis on knowledge and intent—*mens rea* in the terminology of the criminal laws—enhances its quality as a punitive measure.

A final distinction is that, unlike § 3328, Section 12(f) provided a thirty-day period that allowed men who were notified of their nonregistered status to register and thereby comply with the registration requirement. *MPIRG,* 468 U.S. at 849, 104 S.Ct. 3348. This ability to correct registration status is one basis on which the Court in *MPIRG* distinguished the case from *Cummings* and *Garland,* which "dealt with absolute barriers to entry into certain professions." *Id.* at 850–51, 104 S.Ct. 3348. By contrast, under § 3328, if a male employee fails to register by age twenty-six, he will be nonregistered for the rest of his life and consequently will face an absolute lifetime employment barrier such that he can never be eligible to work for a federal agency.

During recent congressional deliberations on amendments to § 3328, the House considered a bill that provided an exemption from the employment prohibition once individuals reached thirty-one years of age. H.R. 4108, 110th Cong. (2007).[6] As reflected in the House Report on the proposed amendment, the Selective Service supported the change: "It is the position of the Selective Service System that the existing lifelong ban on federal employment for individuals who failed to register

---

6. The proposed amendment, which was never passed, thus indirectly acknowledged the punitive character of the current statute. Its modification from a lifetime bar to a five-year bar, after which an individual would be eligible for federal employment, of course, mirrors the maximum statute of limitations period applicable as to the direct criminal sanction for failure to register for the draft. *See* 50 App. U.S.C. § 462(a), (d). Indeed, the current employment bar of 5 U.S.C. § 3328 is more harshly punitive than the direct criminal sanction of 50 App. U.S.C. § 462, precisely because it has no limitations period but is rather a lifetime ban.

and are unable to show that their failure was not knowing and willful serves no useful registration purpose or any public policy benefit." *Id.* In short, the agency charged with administering the draft has apparently concluded that the measure serves no nonpunitive remedial purpose in encouraging compliance with the registration process. I share the view that the plain purpose of the statute is not remedial but punitive.

### c. Legislative record of primary purpose

■ The third factor for evaluating punitive character is legislative history regarding congressional intent to punish. In demonstrating this punitive intent, the Plaintiffs face a considerable burden: "only the clearest proof would suffice." *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). The burden is overcome here because that clear proof is available in the legislative history of § 3328.

Senator Thurmond, who introduced the Senate version of the bill, made clear that the intentions behind the proposed law were retributive. He stated in support of the legislation that "[t]hose who irresponsibly violate the Selective Service statutes should not be allowed the benefit of a civil service job.... It is only fair." 131 Cong. Rec. S6627–02 (May 21, 1985) (statement of Sen. Thurmond). He elaborated on this retributive purpose by observing that failure to register "is particularly appalling when one considers that the possibility exists that a nonregistrant could obtain employment ahead of a veteran." *Id.* He contended that "to permit an individual to enjoy the privileges and benefits of civil service positions is not only unfair to taxpayers, it is unpatriotic." *Id.* Other legislative commentary suggests a punitive intent, albeit one targeted more toward a deterrent than a retributive goal. Senator

Nunn, for example, stated, "I think it is important that we enforce [the Registration Act] and that we have sanctions for enforcement." *Id.* The legislative history establishes that in imposing "sanctions" on those who failed to register for the draft, the congressional purpose was primarily and essentially punitive.

### 3. Lack of a judicial trial

■ It is not disputed that individuals affected by § 3328 receive no meaningful judicial evaluation before being terminated or deemed ineligible for federal agency employment. Indeed, no judicial oversight at all is available. OPM decisions are governed by the Civil Service Reform Act (CSRA), which created the OPM and authorized it to prescribe regulations for the civil service. 5 U.S.C. § 1302(a). The CSRA created "an integrated scheme" regulating administrative and judicial review of contested employment actions. *United States v. Fausto*, 484 U.S. 439, 445, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Dotson v. Griesa*, 398 F.3d 156, 163 (2d Cir. 2005). When the CSRA applies to an action, the plaintiff has no right to judicial review. *Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 32 (1st Cir.2001). The Defendants concede that an individual has no right of judicial review of an OPM decision regarding whether he knowingly and willfully failed to register with the Selective Service System.

But the Defendants insist that because the judicially unreviewable OPM hearing is performed by the executive branch, rather than the legislative branch, the statute does not qualify as *legislative* punishment. The test for bill of attainder, however, is whether the targeted individuals receive a judicial evaluation, not whether the legislature engages directly in the implementation of the punishment or delegates it to the executive branch. OPM decisionmak-

ing procedure regarding the MSSA is particularly rigid, in large part because of the constraints placed on it by Congress. The MSSA includes a provision that "[e]very person shall be deemed to have notice of the requirements of this title upon publication by the President of a proclamation or other public notice...." 50 App. U.S.C. § 465(a). The parties have not submitted and I have found no OPM determination in which an individual has successfully overcome this legislative presumption of knowing and willful failure to register.

The OPM, based on the legislative instruction of 50 App. U.S.C. § 465(a), has denied the applications of individuals with compelling circumstances which, but for the "deeming" presumption, appear to have the indicia of lack of knowledge and intent. For example, in *Clarke v. Office of Personnel Mgmt.*, No. H–07–0662, 2007 WL 2363295 (S.D.Tex. Aug. 17, 2007), the district court describes an individual born in the United States, but who moved to Canada when he was four years old. *Id.* at *1. The plaintiff retained his U.S. citizenship, and visited the United States on vacations, but otherwise had no contact with government officials. *Id.* He moved to Houston from Canada in 2000 at the age of twenty-six. In 2003, when he learned that federal law required him to register with the Selective Service in order to be eligible for federal employment, he tried to register but found that he was too old to do so. After Clarke sought employment with U.S. Customs and Border Protection, the OPM determined that Clarke's failure to register was knowing and willful. Despite Clarke's circumstances, including his Canadian residence until age twenty-six, the OPM ruled woodenly that "every person is deemed to have notice of the requirements of the Selective Service Requirement." *Id.* at *2. The district court found that it had no jurisdiction to review this determination.

In another case, a veteran, who served on active duty for almost fourteen years and then went into active duty with the National Guard before transferring to the Army Reserves, was found ineligible for federal employment as a heavy mobile equipment repairer because he had not presented himself for registration. *Wyche v. Army*, 2003 WL 21417221 (M.S.P.B. Apr. 2003). President Carter's Proclamation 4771 provided a brief six-day registration window between July 21 and July 27, 1980 for those persons born in 1960, such as the appellant, who had already turned eighteen before registration was reactivated. 45 Fed.Reg. 45,247, § 1–102. The appellant contended he had entered the U.S. Army in 1979 under a delayed entry program while he completed high school before actually entering active duty on August 28, 1980. *Wyche*, 2003 WL 21417221, at *3. The Administrative Law Judge for the Merit Systems Protection Board, in the course of a decision holding that the Board did not have jurisdiction over the decision to terminate his appointment, observed that "[a]lthough the result in this appeal does not seem equitable, I find there is a statutory prohibition that renders the applicant ineligible for appointment." *Id.* at *4. Thus, a veteran who entered active military service immediately after high school was denied federal employment because "he should already have registered within 30 days of his 18th birthday; and registration after reaching age 26 is prohibited by law." *Id.* at *7 n. 3.

Although Congress has purported to delegate evaluative tasks to the OPM, the statute specifies a group for punishment based on irreversible past inaction under a regime which bars any exception by application of what for all intents and purposes is an irrebuttable presumption. It is undisputed that this group does not receive a judicial trial under the statute. Even

without the rigid formalism by which subordinate executive branch employees execute the congressional direction, an OPM administrative hearing fails to qualify as a comparable substitute for a judicial trial. *See MPIRG,* 468 U.S. at 847 n. 3, 104 S.Ct. 3348 (rejecting as "meritless" the government's argument that Section 12(f) of the MSSA, 50 App. U.S.C. § 462(f), does not dispense with a judicial trial by providing a hearing to determine if the applicant is registered). The statute's punishment is imposed after a "trial" by legislation, specifically directing essentially ministerial executive decisionmaking without any judicial role.

### 4. Conclusion

Because I find that § 3328 satisfies the three elements necessary to establish an unconstitutional bill of attainder for men twenty-six years of age or older who have not registered for the draft, I deny the Defendants' Motion to Dismiss Count One. With respect to the challenge to the statute Plaintiffs have mounted in their motion for partial summary judgment on this count, I conclude that no circumstances exist that would permit Congress, in contravention of the Constitution's Bill of Attainder Clause, to prohibit nonregistered males age twenty-six and older from federal agency employment for their lifetimes without judicial decisionmaking. I will therefore allow Plaintiffs' Motion for Partial Summary Judgment as to Count I.

### B. Equal Protection

The remaining issue is the equal protection claim, which the Defendants argue should be dismissed because the MSSA does not discriminate on the basis of sex. In 1981, the Supreme Court considered

and accepted the government's argument against an identical equal protection claim in *Rostker,* 453 U.S. 57, 101 S.Ct. 2646. The Plaintiffs seek the opportunity to engage in discovery to develop facts regarding the evolution of the female military role since *Rostker.* The Plaintiffs contend that an apparent evolution in that role has weakened the foundation of that opinion. I find insufficient change in the governing considerations since *Rostker* was handed down to justify permitting the equal protection aspect of this litigation to continue any further. In doing so, I join my colleague Judge Harrington in concluding such a claim must be dismissed. *Schwartz v. Brodsky,* 265 F.Supp.2d 130 (D.Mass. 2003).

### 1. Legal principles

The Plaintiffs' equal protection claim purports to state allegations under both the Fifth and Fourteenth Amendments. The Fourteenth Amendment applies only to states and consequently is inapplicable. Although the Fifth Amendment does not by term have an Equal Protection Clause, the Due Process Clause of the Fifth Amendment has been interpreted to include an equal protection requirement. *Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

 Equal protection analysis for sex-based discrimination involves "heightened review" of the challenged governmental action.[7] *United States v. Virginia,* 518 U.S. 515, 516, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Under this heightened scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,*

---

7. The Plaintiffs erroneously suggest a "strict scrutiny" standard is applicable for sex-based discrimination.

429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

The MSSA's constitutionality under the Fifth Amendment equal protection jurisprudence was analyzed fully by the Supreme Court in *Rostker,* 453 U.S. 57, 101 S.Ct. 2646, which held that the sex-based registration system under the MSSA did not violate the equal protection guarantees of the Fifth Amendment. *Id.* at 83, 101 S.Ct. 2646. The governmental objective identified in *Rostker* was "to develop a pool of potential combat troops," *id.* at 79, 101 S.Ct. 2646, an objective deemed by the Court to be an important one. *Id.* at 70, 101 S.Ct. 2646. Restricting registration to male applicants was said to be "closely related" to that interest because Congress had determined that females could not serve as combat troops. *Id.* at 79, 101 S.Ct. 2646. The Plaintiffs contend that the factual underpinnings of the Supreme Court's position in 1981 are no longer applicable.

Before considering these claims, it is worth noting that at the core of the Court's ruling in *Rostker* was the deference owed Congress and the executive by the courts in matters of national security and military policy. *Rostker,* 453 U.S. at 64–65, 101 S.Ct. 2646. *Rostker* emphasized that when a case arises in this context, the courts grant Congress greater deference than in any other area. *Id.* That, of course, does not mean that courts "abdicate [their] ultimate responsibility to decide the constitutional question," *id.* at 67, 101 S.Ct. 2646, but the courts should avoid replacing a reasonable evaluation by the legislative branch with a judicial evaluation of what is desirable. *Id.* at 68, 101 S.Ct. 2646.

**2. Application to current circumstances**

The Plaintiffs challenge the factual basis of both prongs of the *Rostker* analysis: whether the statute continues to serve an important governmental objective, and whether the male-only registration system is substantially related to that interest.

**a. Governmental objective**

The Plaintiffs contend in their briefing that it is no longer evident the sole purpose of the draft would be to supply combat troops. Rather, they seek to use discovery to demonstrate that future drafts will instead focus on filling positions of translators, doctors, nurses, and computer specialists.

The Amended Complaint, however, alleges no facts related to the identity of the governmental objective at stake, let alone whether that objective has changed since *Rostker.* Although the Amended Complaint states conclusorily that "the prohibition against registration by women who are well qualified to serve in the military serves no important governmental objective" (Am. Compl. ¶ 67), there are no nonconclusory allegations to suggest that governmental objective has changed to become unimportant. On this pleading, I must continue to recognize the objective at stake to be the same as determined in *Rostker*: to prepare for a draft of combat troops. *Rostker,* 453 U.S. at 77, 101 S.Ct. 2646.

**b. Substantially related**

The Plaintiffs' focused allegations primarily relate to the prohibition of female registration as a suitable means to achieve the governmental objective of developing a pool of potential combat troops. They allege at a high degree of generality that because the role of female military personnel has changed dramatically in recent years, their exclusion from registration with the Selective Service System is no longer substantially related to an impor-

tant governmental objective. They state that the number of positions open to women has increased, as has the percentage of the armed forces personnel who are female. They observe that women attend all of the military academies; and they note their acceptance in the armed forces is reflected in common references to the "men and women" in Iraq.

But the Plaintiffs have failed to allege that women are eligible for ground combat positions in the military. To be sure, women now may serve on Navy combat ships and fly Navy and Air Force combat aircraft. This resulted from post-*Rostker* legislative changes in 1991 and 1993, which lifted the ban on assigning women to these combat related roles. National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102–190, § 531 (1991) (repealing the statutory ban on assigning women to aircraft engaged in combat), and National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103–160, § 591 (1993) (repealing the statutory ban on assigning women to combat Navy vessels). The Plaintiffs must nevertheless acknowledge that women remain ineligible for assignment to direct combat units on the ground. Memorandum from Secretary of Defense Les Aspin to the Secretaries of the Army, Navy, et al., "Direct Ground Combat Definition and Assignment Rule" (Jan. 13, 1994). The Defendants argue that because current military policy prohibits women from serving in direct ground combat assignments, the facts underlying the "substantially related" prong in *Rostker* have not materially changed.

The exclusion of women from combat positions was a crucial factor in the Supreme Court's assessment in *Rostker*. The circumstances today, as alleged by the Plaintiffs, have changed to some degree in that military policy currently permits women to fill some limited combat positions. Yet the Plaintiffs' allegations are still not sufficient to establish that male-only draft registration is no longer substantially related to an important governmental objective. Although women are now permitted to serve in certain positions related to combat settings, the scope of their combat participation does not yet approach that level permitted for male military personnel.

The essential concerns raised and resolved in *Rostker* remain unchanged. The Court stated that with respect to the "substantially related" analysis of the registration system, one consideration is the cost-benefit analysis that Congress must perform. When women could only serve in noncombat roles, the Court found that Congress did not consider it "worth the added burdens of including women in draft and registration plans." *Rostker*, 453 U.S. at 81, 101 S.Ct. 2646. Today, when women can serve in a limited range of combat related positions, it remains the role of Congress and not the courts to determine whether registering women for the draft justifies the added burdens this would involve. Congress has not recalibrated the cost-benefit analysis, nor is there anything in the pleading that suggests they must.

A second congressional concern noted by *Rostker* was whether the registration of women was necessary to fill those positions that the military would in fact need women to fill. Congress concluded at the time it passed the MSSA that the military's needs for positions women could fill could be met by volunteer soldiers. *Rostker*, 453 U.S. at 81, 101 S.Ct. 2646. Because of the combat restrictions placed on women, most of the combat positions continue to be filled by men. The Plaintiffs have failed to allege facts that would establish that this calculation—the number of combat positions females can fill as a proportion of the total combat positions

available, discounted by the number of female volunteers one could expect—has substantially changed as a result of women's access to combat aircraft and ships. Again, Congress has not chosen to undertake such a resolution.

Finally, a concern highlighted in *Rostker* was military flexibility. "Military flexibility requires that a commander be able to move units or ships quickly," and requires recognition that "significant rotation of personnel is necessary." *Rostker*, 453 U.S. at 82, 101 S.Ct. 2646 (quoting S.Rep. No. 96–826, at 158 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2612, 2648). Staffing women in noncombat positions during a military mobilization does not enhance this flexibility because women could not be rotated into ground combat positions. *See Rostker*, 453 U.S. at 81–82, 101 S.Ct. 2646. If women continue to be prohibited from direct combat on the ground, flexibility remains an important concern to which male-only registration is substantially related.

## CONCLUSION

For the reasons set forth more fully above, I conclude the Plaintiffs have demonstrated as a matter of law that 5 U.S.C. § 3328 is an unconstitutional bill of attainder when the statute's federal employment bar is imposed on men aged twenty-six or over; I therefore GRANT the Plaintiffs' Motion for Partial Summary Judgment (Docket No. 19), and DENY Defendants' Motion to Dismiss (Docket No. 10) as to Count One. I conclude further that the Plaintiffs have failed to state a claim that the Military Selective Service Act, 50 App. U.S.C. §§ 451–473, violates the Constitution's equal protection guarantees; I therefore GRANT the Defendants' Motion to Dismiss (Docket No. 10) with respect to Count Two of the Amended Complaint.